LAWYERS FOR CLEAN WATER, INC.
Daniel Cooper (Bar No. 153576)
        Email:  daniel@lawyersforcleanwater.com
Caroline Koch (Bar No. 266068)
        Email:  caroline@lawyersforcleanwater.com
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone:  (415) 440-6520
Facsimile:  (415) 440-4155

*Attorneys for Plaintiffs*
INLAND EMPIRE WATERKEEPER and ORANGE COUNTY COASTKEEPER

*Additional Plaintiffs' Counsel Listed On Next Page*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

ED CV 14 - 00070 VAP (DTBx)

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of ORANGE COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER, a California non-profit corporation, | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>COPY<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |
| Plaintiffs, | |
| vs. | |
| BURRTEC WASTE GROUP, INC., a California corporation; BURRTEC WASTE INDUSTRIES, INC., a California corporation; AGUA MANSA MRF, LLC, a California limited liability company, | |
| Defendants. | |

Complaint                                        1

INLAND EMPIRE WATERKEEPER
Colin Kelly (Bar No. 266956)
          Email:  colin@iewaterkeeper.org
6876 Indiana Avenue, Suite D
Riverside, California 92506
Telephone:  (951) 530-8823
Facsimile:  (951) 530-8824


ORANGE COUNTY COASTKEEPER
Colin Kelly (Bar No. 266956)
          Email:  colin@coastkeeper.org
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone:  (714) 850-1965
Facsimile:  (714) 850-1592

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeeper" or "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.   On 8 October 2013, Waterkeeper issued a sixty (60) day notice letter of intent to sue ("Notice Letter") to Agua Mansa MRF, LLC; Burrtec Waste Industries, Inc.; and Burrtec Waste Group, Inc. (collectively "Defendants") for their violations of the Clean Water Act and California's Permit for Discharges of Stormwater Associated with Industrial Activities. The Notice Letter was also sent to the registered agent for Defendants, as required by 40 C.F.R. § 135.2(a)(1). Finally, the Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board") as required by the CWA. 40 C.F.R. § 135.2(a)(1). The Notice Letter is attached hereto as Exhibit A and is incorporated herein by reference.

3.   More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4.   Venue is proper in the Central District of California pursuant to Section

1 | 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are
2 | located within this judicial district.

3 | **II.**   **INTRODUCTION**

4 |     5.    This Complaint seeks relief for Defendants' substantive and procedural
5 | violations of California's Permit for Discharges of Stormwater Associated with Industrial
6 | Activities (National Pollution Discharge Elimination System General Permit No.
7 | CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-
8 | DWQ, as amended by Order No. 97-03-DWQ) (hereinafter "Storm Water Permit")
9 | resulting from their operations at 1830 Agua Mansa Road, Riverside, California 92509
10 | ("RA Nelson Facility").

11 |     6.    Waterkeeper specifically alleges that Defendants' discharges of pollutants
12 | from the RA Nelson Facility into waters of the United States; violations of the filing,
13 | monitoring and reporting, and best management practice requirements; and violations of
14 | other procedural and substantive requirements of the Storm Water Permit and the CWA
15 | are ongoing and continuous.

16 |     7.    With every storm event, hundreds of millions of gallons of polluted
17 | rainwater, originating from industrial operations such as the RA Nelson Facility, pour
18 | into area surface waters. The consensus among agencies and water quality specialists is
19 | that storm water pollution accounts for more than half of the total pollution entering the
20 | marine and river environments each year. Surface waters are ecologically sensitive areas
21 | and although pollution and habitat destruction have drastically diminished once-abundant
22 | and varied fisheries, surface waters are still essential habitat for dozens of fish and bird
23 | species as well as macro-invertebrate and invertebrate species. Storm water contaminated
24 | with sediment, heavy metals, and other pollutants harm the special aesthetic and
25 | recreational significance that surface waters have for people in surrounding communities.
26 | Public use of area surface waters for water contact sports exposes many people to toxic
27 | metals and other contaminants in storm water and non-storm water discharges. Non-
28 | contact recreational and aesthetic opportunities, such as wildlife observation, are also

---

1   impaired by polluted discharges to those waters.

2   **III.     PARTIES**

3       **A.     Inland Empire Waterkeeper and Orange County Coastkeeper.**

4       8.     Inland Empire Waterkeeper is a program of Orange County Coastkeeper.

5   Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D,

6   Riverside, California 92506.

7       9.     Orange County Coastkeeper is a non-profit public benefit corporation

8   organized under the laws of the State of California. Orange County Coastkeeper's office

9   is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

10       10.     Together, Inland Empire Waterkeeper and Orange County Coastkeeper have

11   over 2,000 members who live and/or recreate in and around the Santa Ana River

12   watershed. Waterkeeper is dedicated to the preservation, protection, and defense of the

13   environment, wildlife, and natural resources of local surface waters. To further these

14   goals, Waterkeeper actively seeks Federal and State agency implementation of the Clean

15   Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself

16   and others.

17       11.     Waterkeeper members use and enjoy the Santa Ana River and its tributaries

18   for fishing, boating, swimming, bird watching, picnicking, viewing wildlife, sailing,

19   kayaking, hiking, and engaging in scientific study, including monitoring activities.

20       12.     Discharges of polluted storm water and non-storm water from the RA

21   Nelson Facility degrade water quality and harm aquatic life in the Santa Ana River and

22   its tributaries, and impair Waterkeeper's members' use and enjoyment of those waters.

23       13.     The violations of the Storm Water Permit at the RA Nelson Facility are

24   ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are

25   being, and will continue to be adversely affected by Defendants' failure to comply with the

26   Storm Water Permit and the CWA.

27       **B.     The RA Nelson Facility Owners and/or Operators.**

28       14.     Waterkeeper is informed and believes, and thereon alleges, that Agua Mansa

1  MRF, LLC is an owner of the RA Nelson Facility.

2      15.   Waterkeeper is informed and believes, and thereon alleges, that Agua Mansa

3  MRF, LLC is an operator of the RA Nelson Facility.

4      16.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

5  Waste Industries, Inc. is an owner of the RA Nelson Facility.

6      17.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

7  Waste Industries, Inc. is an operator of the RA Nelson Facility.

8      18.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

9  Waste Group, Inc. wholly owns Burrtec Waste Industries, Inc.

10     19.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

11 Waste Group, Inc. is an owner of the RA Nelson Facility.

12     20.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

13 Waste Group, Inc. is an operator of the RA Nelson Facility.

14     21.   Waterkeeper refers to Agua Mansa MRF, LLC, Burrtec Waste Industries,

15 Inc., and Burrtec Waste Group, Inc. collectively as the "RA Nelson Facility Owners

16 and/or Operators."

17     22.   Waterkeeper is informed and believes, and thereon alleges, that Agua Mansa

18 MRF, LLC is an active limited liability company registered in California.

19     23.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

20 Waste Group, Inc. is an active corporation registered in California.

21     24.   Waterkeeper is informed and believes, and thereon alleges, that Burrtec

22 Waste Industries, Inc. is an active corporation registered in California.

23     25.   Waterkeeper is informed and believes, and thereon alleges, that the name

24 and address of the Registered Agent for Agua Mansa MRF, LLC is Cole Burr, 9890

25 Cherry Avenue, Fontana, California 92335.

26     26.   Waterkeeper is informed and believes, and thereon alleges, that the name

27 and address of the Registered Agent for Burrtec Waste Industries, Inc. is Cole Burr, 9890

28 Cherry Avenue, Fontana, California 92335.

27.     Waterkeeper is informed and believes, and thereon alleges, that the name and address of the Registered Agent for Burrtec Waste Group, Inc. is Cole Burr, 9890 Cherry Avenue, Fontana, California 92335.

28.     Waterkeeper is informed and believes, and thereon alleges, that Burrtec Waste Group, Inc. and Burrtec Waste Industries, Inc. also operate four other industrial facilities located at: 988 North Waterman Canyon Road, Crestline, California 92325; 9890 Cherry Avenue, Fontana, California, 92335; 5455 Industrial Parkway, San Bernardino, California, 92407; and 13373 Napa Street, Fontana, California 92335 ("Burrtec Facilities").

29.     Plaintiffs seek relief for the unlawful discharges of pollutants into waters of the United States from Defendants' activities at the Burrtec Facilities in separate complaints filed with the Court. These matters are related, as they also allege violations of the Storm Water Permit against Burrtec Waste Group, Inc. and Burrtec Waste Industries, Inc., as well as other operators of the Burrtec Facilities. Waterkeeper is filing a Notice of Related Cases concurrently with each complaint.

## IV.     LEGAL BACKGROUND

### A.     The Clean Water Act.

30.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

31.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

32.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), establishes a framework for regulating industrial storm water discharges under the NPDES program. States with

1  approved NPDES permit programs are authorized by section 402(b) to regulate industrial
2  storm water discharges through individual NPDES permits issued to dischargers and/or
3  through the issuance of a single, statewide, general NPDES permit applicable to all
4  industrial storm water dischargers. *See* 33 U.S.C. § 1342(b).

5      33.    In California, the State Board is charged with regulating pollutants to protect
6  California's water resources. *See* Cal. Water Code § 13001.

7      34.    The Storm Water Permit is a statewide general NPDES permit issued by the
8  State Board pursuant to section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R
9  § 123.25.

10     35.    In order to discharge storm water lawfully in California, industrial
11  dischargers must secure coverage under the Storm Water Permit and comply with its
12  terms, or obtain and comply with an individual NPDES permit.

13     36.    Violations of the Storm Water Permit are also violations of the CWA. *See*
14  Storm Water Permit, Section C(1).

15     37.    Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen
16  enforcement actions against any "person" who is alleged to be in violation of an "effluent
17  standard or limitation . . . or an order issued by the Administrator or a State with respect
18  to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

19     38.    Burrtec Waste Industries, Inc. is a "person" within the meaning of section
20  502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

21     39.    Burrtec Waste Group, Inc. is a "person" within the meaning of section
22  502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

23     40.    Agua Mansa MRF, LLC is a "person" within the meaning of section 502(5)
24  of the Clean Water Act, 33 U.S.C. § 1362(5).

25     41.    An action for injunctive relief is authorized under section 505(a) of the
26  CWA, 33 U.S.C. § 1365(a).

27     42.    Each separate violation of the Clean Water Act subjects the violator to a
28  penalty of up to $32,500 per day per violation for violations occurring prior to 12 January

Complaint                                    8

1  2009, and $37,500 per day per violation for violations occurring on and after 12 January

2  2009. 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for

3  Inflation, 40 C.F.R. § 19.4.

4      43.    Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), allows

5  prevailing or substantially prevailing parties to recover litigation costs, including

6  attorneys' fees, experts' fees, and consultants' fees.

7      **B.    The Storm Water Permit's Effluent Limitations, Receiving Water**

8          **Limitations, and Discharge Prohibitions.**

9      44.    Effluent Limitation B(3) of the Storm Water Permit requires dischargers to

10  reduce or prevent pollutants associated with industrial activity in storm water discharges

11  through the implementation of Best Available Technology Economically Achievable

12  ("BAT") for toxic or non-conventional pollutants and Best Conventional Pollutant

13  Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40

14  C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional

15  pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand

16  ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal

17  coliform, among others.

18      45.    EPA's NPDES Multi-Sector General Permit for Stormwater Discharges

19  Associated With Industrial Activity ("MSGP") sets numeric benchmarks for pollutant

20  concentrations in storm water discharges ("EPA Benchmarks").

21      46.    The EPA Benchmarks provide an objective standard to determine whether a

22  facility's Best Management Practices ("BMPs") are successfully developed and/or

23  implemented. *See* MSGP Fact Sheet, at 95 (2008) *available at*

24  http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf.

25      47.    Discharges from an industrial facility containing pollutant concentrations

26  that exceed EPA Benchmarks indicate that the facility has not successfully developed

27  and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional

28  pollutants, in violation of Effluent Limitation B(3). *Id.*

48.     Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water and non-storm water discharges that adversely impact human health or the environment.

49.     Discharges with pollutant levels that exceed levels known to adversely impact human health and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

50.     Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water and non-storm water discharges that "cause or contribute to an exceedance of any applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

51.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA, to be protective of the beneficial uses of the waters that receive polluted discharges. The Water Quality Control Plan for the Santa Ana River Basin, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed. (Rev. June 2011) ("Basin Plan"), identifies the "Beneficial Uses" of water bodies in the region.

52.     The Beneficial Uses for the Santa Ana River near and downstream of the point at which it receives polluted discharges from the RA Nelson Facility are: Agricultural Supply; Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species. *See* Basin Plan, Table 3-1.

53.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharges.

54.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

55.     The 2010 303(d) List of Impaired Water Bodies identifies Lytle Creek as

1   impaired for pathogens.[1]

2       56.    Reach 4 of the Santa Ana River is impaired for pathogens. *Id.*

3       57.    Reach 3 of the Santa Ana River is impaired for copper, lead, and pathogens.

4   *Id.*

5       58.    Reach 2 of the Santa Ana River is impaired for indicator bacteria. *Id.*

6       59.    WQS applicable to dischargers covered by the Storm Water Permit include,

7   but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic

8   Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

9       60.    The CTR includes numeric criteria set to protect human health and the

10  environment in the State of California.[2]

11      61.    Discharges that cause or contribute to pollutant levels in receiving waters

12  that exceed the CTR criteria, the Basin Plan, and/or other applicable WQS, are violations

13  of Receiving Water Limitation C(2) of the Storm Water Permit.

14      62.    Except as otherwise authorized, Discharge Prohibition A(1) of the Storm

15  Water Permit prohibits permittees from discharging materials other than storm water

16  (non-storm water discharges) either directly or indirectly to waters of the United States.

17  Prohibited non-storm water discharges must be either eliminated or permitted by a

18  separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition A(1).

19      63.    Unauthorized discharges of materials other than storm water (non-storm

20  water) are violations of Discharge Prohibition A(1) of the Storm Water Permit.

21  **C.**    **The Storm Water Permit's Storm Water Pollution Prevention Plan**

22         **Requirements.**

23      64.    Section A(1) and Provision E(2) of the Storm Water Permit require

24  dischargers to develop and implement a Storm Water Pollution Prevention Plan

25  [1] 2010 Integrated Report – All Assessed Waters, *available at*:

26  http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml (last
    accessed on November 1, 2013).

27  [2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic

28  Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*
    http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

1 ("SWPPP") that complies with the requirements of the Storm Water Permit prior to
2 commencing industrial activities.

3     65.    The objectives of the SWPPP are to identify and evaluate sources of
4 pollutants associated with industrial activities that may affect the quality of storm water
5 discharges, to identify and implement site-specific BMPs to prevent the exposure of
6 pollutants to storm water, and to reduce or prevent the discharge of polluted storm water
7 from industrial facilities. Storm Water Permit, Section A(2).

8     66.    Section A(3) of the Storm Water Permit requires a discharger to identify the
9 members of its on-site Storm Water Pollution Prevention Team and to indicate each team
10 member's responsibilities in developing, implementing, and revising the SWPPP to
11 ensure compliance with the Storm Water Permit.

12     67.    Section A(4) of the Storm Water Permit requires that the SWPPP include a
13 site map that indicates specified information, including but not limited to: the facility
14 boundaries; an outline of all storm water drainage areas within the facility boundaries;
15 storm water drainage areas and directions of flow for each drainage area; on-site surface
16 water bodies; nearby water bodies; areas of soil erosion; municipal storm drain inlets
17 where the facility's storm water discharges may be received; the location of the storm
18 water collection, conveyance and discharge system and structural control measures that
19 affect storm water discharges; an outline of all impervious areas of the facility, including
20 paved areas, buildings, covered storage areas, and other roofed structures; locations
21 where materials are directly exposed to precipitation and where significant spills or leaks
22 have occurred; and all areas of industrial activity, including areas that are actual and
23 potential pollutant sources.

24     68.    Section A(5) of the Storm Water Permit requires that the SWPPP include a
25 list of significant materials handled and stored at the site. For each material identified on
26 the list, the discharger must describe certain specified information, including locations
27 where the material is typically stored, received, or handled, as well as typical quantities
28 and frequency of the material at the facility.

69.     Section A(6) of the Storm Water Permit requires a discharger to include in its facility SWPPP a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges or authorized non-storm water discharges. Section A(6) also requires the facility SWPPP to include a table summarizing such information and linking potential pollutant sources to specific control measures.

70.     Section A(7) of the Storm Water Permit requires a discharger to include in its facility SWPPP a narrative evaluation of all industrial activities and potential pollutant sources at the facility.

71.     Section A(8) of the Storm Water Permit requires a discharger to include in its facility SWPPP a narrative description and a summary of the storm water BMPs to be implemented at the facility. Each BMP must be linked to the potential pollutant source it is intended to remedy. BMPs must be described for all potential pollutant sources at the facility, including those identified pursuant to Sections A(6) and A(7) of the Storm Water Permit.

72.     Section A(9) of the Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit.

73.     Sections A(9)(a)-(c) of the Storm Water Permit require that the discharger conduct an Annual Comprehensive Site Compliance Evaluation ("ACSCE Report") that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented, and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP.

74.     Section A(9)(d) of the Storm Water Permit requires that the ACSCE Report includes an identification of personnel performing the evaluation, the date(s) of the

evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any instances of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. If certification of compliance cannot be provided, the discharger must explain in the ACSCE Report why the facility is not in compliance with the Storm Water Permit. The ACSCE Report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit.

75.   Section A(10)(d) of the Storm Water Permit requires a facility to revise and implement the revised SWPPP within ninety (90) days after the facility operator determines that its SWPPP is not in compliance with the Storm Water Permit.

**D.   The Storm Water Permit's Monitoring and Reporting Requirements.**

76.   Section B(1) and Provision E(3) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") when industrial activities commence.

77.   The objectives of the M&RP are to ensure that BMPs have been adequately developed, implemented, and revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

78.   The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. Storm Water Permit, Sections B(2)(c) and B(2)(d).

79.   Section B(2)(d) of the Storm Water Permit requires that the M&RP be revised as necessary to ensure compliance with the Storm Water Permit.

80.   Section B(3) of the Storm Water Permit requires a discharger to conduct visual observations of all drainage areas within the facility for the presence of authorized and unauthorized non-storm water discharges. Observations under this section must occur during daylight hours, on days with no storm water discharges, and during scheduled

Complaint                              14

1    facility operating hours.

2       81.    Section B(4) of the Storm Water Permit requires a discharger to conduct

3    visual observations of storm water discharges during at least one storm event per month

4    during the Wet Season (October 1 – May 1) in the first hour of discharge at each

5    discharge location. Observations under this section must take place during daylight hours,

6    when the discharge is preceded by at least three (3) days without storm water discharges,

7    and during scheduled facility operating hours.

8       82.    Both Sections B(3) and B(4) of the Storm Water Permit require a discharger

9    to document and record visual observations. Records of observation must describe the

10   presence of any floating or suspended materials, O&G, discolorations, turbidity, odor,

11   and the source of any pollutants observed during the visual observation. Dischargers must

12   maintain records of visual observations that include the observation date, locations

13   observed, and responses taken to eliminate unauthorized non-storm water discharges and

14   to reduce or prevent pollutants from contacting non-storm water and storm water

15   discharges. Furthermore, Sections B(3) and B(4) require a discharger to revise its facility

16   SWPPP in order to rectify any instances of noncompliance observed during visual

17   observations.

18      83.    Sections B(5) and (7) of the Storm Water Permit require a discharger to

19   visually observe and collect samples of storm water discharges from all locations where

20   storm water is discharged.

21      84.    Section B(5)(a) of the Storm Water Permit requires a discharger to collect

22   storm water samples during the first hour of discharge from the first storm event of the

23   Wet Season and at least one other storm event during the Wet Season. All storm water

24   discharge locations must be sampled. *See* Storm Water Permit, Section B(5)(a). Facility

25   operators that do not collect samples from the first storm event of the Wet Season are still

26   required to collect samples from two other storm events of the Wet Season and must

27   explain in the Annual Report why the first storm event was not sampled. *Id.*

28      85.    Section B(5)(b) of the Storm Water Permit requires that sampling conducted

Complaint                                    15

1  pursuant to the Storm Water Permit occur during scheduled facility operating hours that
2  are preceded by at least three (3) working days without storm water discharge.

3       86.    Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze
4  each sample for pH, specific conductance ("SC"), TSS, and total organic carbon
5  ("TOC"). A discharger may elect to analyze for O&G instead of TOC.

6       87.    Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to
7  analyze each sample for toxic chemicals and other pollutants likely to be present in the
8  storm water discharged from the facility in significant quantities.

9       88.    Section B(5)(c)(iii) of the Storm Water Permit requires dischargers to
10  analyze for additional parameters depending on the facility's Standard Industrial
11  Classification ("SIC") code, as indicated in Table D of the Storm Water Permit. Facilities
12  classified as SIC codes 4953 and 5093 must also analyze samples for ammonia,
13  magnesium, chemical oxygen demand ("COD"), arsenic, cadmium, cyanide, lead,
14  mercury, selenium, silver, zinc, copper, aluminum, and iron. Storm Water Permit, Table
15  D.

16       89.    Section B(14) of the Storm Water Permit requires that dischargers submit an
17  Annual Report to the applicable regional board by 1 July of each year. The Annual
18  Report must include a summary of visual observations and sampling results, an
19  evaluation of the visual observations and sampling and analysis results, laboratory
20  reports, the ACSCE Report specified in Section A(9), an explanation of why a facility did
21  not implement any activities required by the Storm Water Permit, and the records
22  specified in Section B(13).

23       90.    Section C(9) of the Storm Water Permit requires that all reports,
24  certifications, and other information required by the Storm Water Permit or requested by
25  a regional board be signed by an authorized representative of the facility's operators.

26       91.    Section C(10) of the Storm Water Permit requires any signatory subject to
27  Section C(9) to make the following certification: "I certify under penalty of law that this
28  document and all attachments were prepared under my direction or supervision in

accordance with a system designed to ensure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

92.    Section C(11)(b) of the Storm Water Permit requires facility operators to give advance notice to the regional board or local storm water agency of anticipated noncompliance with the Storm Water Permit.

93.    Section C(11)(d) of the Storm Water Permit requires facility operators to report any incidence of noncompliance with the Storm Water Permit at the time monitoring reports are submitted. Reports of noncompliance must contain: (1) a description of noncompliance and its cause; (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue; and (3) steps taken or planned to reduce a prevent recurrence of the noncompliance.

## V.    FACTUAL BACKGROUND

### A.    The RA Nelson Facility's Storm Water Permit Coverage.

94.    Waterkeeper is informed and believes, and thereon alleges that the State Board Storm Water Multiple Application & Report Tracking System ("SMARTS") shows that the State Board confirmed receipt of a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") for the RA Nelson Facility on 14 January 2009 ("2009 NOI Receipt").

95.    Waterkeeper is informed and believes, and thereon alleges that the RA Nelson Facility submitted a second NOI to the State Board on 6 July 2012 ("2012 NOI").

96.    The 2012 NOI identifies the Facility name and location as "RA Nelson MRF Transfer Station, 1830 Agua Mansa Rd 1850 Agua M, Riverside."

97.    The 2012 NOI identifies the Facility operator as "Agua Mansa MRF, LLC,

Complaint                                    17

1   13373 Napa St., Fontana, CA 92335."

2       98.   Waterkeeper is informed and believes, and thereon alleges that SMARTS

3   identifies the Facility name and location as "RA Nelson MRF Transfer Station, 1830

4   Agua Mansa Rd, Riverside, CA, 92509."

5       99.   Waterkeeper is informed and believes, and thereon alleges that SMARTS

6   lists the RA Nelson Facility's coverage under the Storm Water Permit as "Active."

7       100.   The 2012 NOI and SMARTS list the RA Nelson Facility Waste Discharger

8   Identification Number ("WDID") as 8 36I021996.

9       101.   The 2012 NOI and 2009 NOI Receipt identify the SIC code for the RA

10   Nelson Facility as 4212 (Local Trucking, Without Storage).

11       102.   Waterkeeper is informed and believes, and thereon alleges that the RA

12   Nelson Facility SWPPP states that the Facility is classified under SIC codes 4212 (Local

13   Trucking Without Storage), 4953 (Hazardous Waste Treatment Storage and Disposal

14   Facilities), and 5093 (Scrap Recycling Facilities).

15       103.   Waterkeeper is informed and believes, and thereon alleges, that the

16   applicable SIC codes for the RA Nelson Facility are 4212, 4953, and 5093.

17       104.   Waterkeeper is informed and believes, and thereon alleges, that Defendants

18   have never amended their 2009 NOI or 2012 NOI to include SIC codes 4953 and 5093 as

19   applicable to the Facility.

20       105.   For facilities classified as 4212, the Storm Water Permit requires permit

21   coverage only for the portions of the facility involved in vehicle maintenance (including

22   repair, rehabilitation, lubrication, painting and fueling), and other operations associated

23   with industrial activity. Storm Water Permit, Attachment 1, Section 8.

24       106.   Facilities classified under SIC codes 4953 and 5093 require Storm Water

25   Permit Coverage for the entire facility. Storm Water Permit, Attachment 1, Sections 4, 6.

26       107.   The RA Nelson Facility SWPPP states that the Facility is 21.4 acres in size.

27       108.   The 2012 NOI indicates that the RA Nelson Facility Owners and/or

28   Operators applied for Storm Water Permit coverage for 22.3 acres of the Facility.

---

Complaint               18

**B.    Industrial Activities at The RA Nelson Facility.**

109.   Waterkeeper is informed and believes, and thereon alleges, that the following industrial activities are conducted at the RA Nelson Facility: processing, loading, and unloading of solid waste and recyclable materials such as hazardous materials, green/wood waste and construction/demolition materials; green waste grinding; production of soil amendment from green wastes; storage of solid waste materials including, but not limited to, household hazardous materials; vehicle and equipment cleaning operations; vehicle and equipment refueling; vehicle and equipment maintenance; storage of materials associated with equipment and vehicle maintenance; and storage of vehicles and equipment.

110.   Waterkeeper is informed and believes, and thereon alleges, that hazardous materials, including, but not limited to, oil, hydraulic fluid, brake fluid, and antifreeze are generated and/or stored at the RA Nelson Facility.

111.   Waterkeeper is informed and believes, and thereon alleges, that industrial activities at the RA Nelson Facility are conducted outdoors and without cover.

112.   Waterkeeper is informed and believes, and thereon alleges, that outdoor industrial activities at the RA Nelson Facility are conducted without secondary containment or other measures to prevent polluted discharges from the Facility.

113.   Waterkeeper is informed and believes, and thereon alleges, that pollutants are tracked from vehicle maintenance and washing areas at the RA Nelson Facility to uncovered areas, such as vehicle storage areas, loading and unloading areas, and the Facility exits and entryways.

114.   Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with the RA Nelson Facility include, but are not limited to, O&G, heavy metals (such as copper, iron, lead, aluminum, and zinc), TSS, nutrients, synthetic organic compounds, pesticides, pathogens, and trash.

115.   Waterkeeper is informed and believes, and thereon alleges, that sources of pollutants at the RA Nelson Facility include, but are not limited to: truck and equipment

storage and maintenance, hazardous waste storage, storage of materials associated with vehicle maintenance and repair, vehicle tracking, and other industrial activities.

116.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the RA Nelson Facility.

117.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately develop and/or implement BMPs sufficient to prevent polluted storm water from discharging from the RA Nelson Facility.

118.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately develop and/or implement required BMPs to prevent prohibited non-storm water discharges from the RA Nelson Facility.

119.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners' and/or Operators' failure to properly address pollutants and their sources results in the discharge of polluted storm water and/or non-storm water from the RA Nelson Facility.

### C.   Discharge Locations at the RA Nelson Facility.

120.   The RA Nelson Facility 2012-2013 Annual Report indicates that there are at least six (6) discharge points at the Facility.

121.   The RA Nelson Facility SWPPP and site map divide the Facility into eleven "drainage areas" identified as Area A through Area K. Waterkeeper is informed and believes, and thereon alleges that storm water from each of these drainage areas discharges to Receiving Waters via discharge points located throughout the Facility.

122.   The Facility SWPPP site map identifies four "SD inlet[s]" and four (4) monitoring points, identified as "MP #1" through "MP #4."

123.   The RA Nelson Facility SWPPP site map indicates that MP #1 and MP #2

1  are located along the southern boundary of the Facility, MP #3 is located near the middle

2  of the southeast boundary of the Facility, and MP #4 is located along the eastern

3  boundary of the Facility.

4       124.   Waterkeeper is informed and believes, and thereon alleges that there are at

5  least seven (7) additional discharge points at the RA Nelson Facility including, but not

6  limited to: the northern curb of Driveway 1, along which water flows to Agua Mansa

7  Road; the southern curb of Driveway 1, along which water flows to Agua Mansa Road;

8  the northern curb of Driveway 2, along which water flows to Agua Mansa Road; the

9  southern curb of Driveway 2, along which water flows to Agua Mansa Road; and three

10  drain outlets along Agua Mansa Road (not including the MP #1 outlet).

11       125.   The RA Nelson Facility SWPPP indicates that "fluids" within the

12  maintenance building and truck wash bay are "captured within the facility and discharged

13  into industrial clarifiers that are connect[ed] to the sanitary sewer system."

14       126.   Waterkeeper is informed and believes, and thereon alleges, that the RA

15  Nelson Facility SWPPP fails to identify all discharge points from the Facility.

16       127.   Waterkeeper is informed and believes, and thereon alleges, that the RA

17  Nelson Facility Owners and/or Operators have failed and continue to fail to collect storm

18  water samples from all discharge points at the Facility.

19       **D.    The RA Nelson Facility's Discharges to the Receiving Water.**

20       128.   Waterkeeper is informed and believes, and thereon alleges, that discharges

21  from the RA Nelson Facility enter municipal separate storm sewer systems ("MS4")

22  operated by the City of Fontana and/or Riverside County and flow to the Santa Ana River

23  ("Receiving Water").

24       129.   Waterkeeper is informed and believes, and thereon alleges, that the Santa

25  Ana River is a water of the United States and is subject to protection under the CWA.

26       130.   Waterkeeper is informed and believes, and thereon alleges, that polluted

27  storm water and non-storm water discharges from the RA Nelson Facility to the

28  Receiving Water.

Complaint                                        21

131.   Waterkeeper is informed and believes, and thereon alleges, that polluted discharges from the RA Nelson Facility adversely impact human health and the environment, and contribute to the degradation of the Santa Ana River, which is an impaired surface water.

132.   Waterkeeper is informed and believes, and thereon alleges, that storm water discharges from the RA Nelson Facility contain levels of pollutants, including aluminum, COD, copper, lead, iron, O&G, pH, SC, TSS, TOC, zinc, and pathogens, such as *E. coli* and coliform bacteria, in excess of levels known to adversely impact aquatic species and the environment, WQS, and EPA Benchmarks, in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

133.   Exceedances of EPA Benchmarks indicate that a facility has not developed and/or implemented adequate BMPs to achieve compliance with BAT/BCT standards, as required by the Storm Water Permit Effluent Limitation B(3) and the Clean Water Act.

134.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have not developed or implemented sufficient BMPs to reduce the levels of pollutants in the RA Nelson Facility's storm water discharges to levels that do not adversely impact human health or the environment, as required by Receiving Water Limitation C(1).

135.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have not developed or implemented sufficient BMPs to reduce the levels of pollutants in the RA Nelson Facility's storm water discharges to levels that do not cause or contribute to exceedances of applicable WQS, as required by Receiving Water Limitation C(2).

136.   Waterkeeper is informed and believes, and thereon alleges, that each time storm water has discharged from the RA Nelson Facility since 20 October 2008 through the present, the RA Nelson Facility Owners and/or Operators have discharged and continue to discharge storm water from the RA Nelson Facility that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm

Water Permit.

**E.    Defendants' Prohibited Non-Storm Water Discharges.**

137. Waterkeeper is informed and believes, and thereon alleges, that water is used for dust control at the RA Nelson Facility.

138. Waterkeeper is informed and believes, and thereon alleges, that water used for dust control at the RA Nelson Facility results in non-storm water discharges from the Facility to the Receiving Water.

139. Waterkeeper is informed and believes, and thereon alleges, that water is used for washing and cleaning activities at the RA Nelson Facility.

140. Waterkeeper is informed and believes, and thereon alleges, that water used for washing and cleaning activities at the RA Nelson Facility results in non-storm water discharges from the Facility to the Receiving Water.

141. Waterkeeper is informed and believes, and thereon alleges, that water used for irrigation drainage at the Facility results in non-storm water discharges from the Facility to the Receiving Water.

142. Waterkeeper is informed and believes, and thereon alleges, that BMPs have not been developed and/or implemented to prevent non-storm water from discharging from the RA Nelson Facility.

143. Waterkeeper is informed and believes, and thereon alleges that the RA Nelson Facility Owners and/or Operators are not otherwise in compliance with Special Conditions D(1).

144. Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water discharges from the RA Nelson Facility to the Receiving Water in violation of Discharge Prohibition A(1).

**F.    Defendants' Failure to Comply with the Storm Water Permit's SWPPP Requirements.**

145. Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility SWPPP site map is inadequate because, among other issues, it fails to

Complaint                                            23

identify all discharge points associated with the Facility's storm water collection and conveyance system, or indicate any areas of soil erosion, as required by Section A(4) of the Storm Water Permit.

146. Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility SWPPP does not include a list of significant materials handled and stored on site, or additional information related to significant materials, including the locations where each material is stored, received, shipped and/or handled, and the typical quantities and frequency of each material at the Facility, as required by Section A(5) of the Storm Water Permit.

147. Waterkeeper is informed and believes, and thereon alleges, that, despite acknowledging the need for additional BMPs in their Annual Reports, the RA Nelson Facility Owners and/or Operators failed to revise the Facility SWPPP to achieve compliance with the Storm Water Permit, as required by Section A(10)(d) of the Storm Water Permit.

148. Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement and/or revise a SWPPP in violation of Section A and Provision E(2) of the Storm Water Permit.

### G.     Defendants' Failure to Comply with the Storm Water Permit's Monitoring and Sampling Requirements.

149. Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to conduct quarterly visual observations of unauthorized non-storm water discharges, as required by Section B(3) of the Storm Water Permit.

150. Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to conduct quarterly visual observations of authorized non-storm water discharges, as required by Section B(3) of the Storm Water Permit.

151.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately document and report visual observations of unauthorized and authorized non-storm water discharges, including by failing to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, as required by Section B(3) of the Storm Water Permit.

152.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to conduct monthly visual observations of storm water discharges during the Wet Season of all discharge locations during the first hour of discharge, as required by Section B(4)(a) of the Storm Water Permit.

153.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately document and report visual observations of storm water discharges, including by failing to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, as required by Section B(4) of the Storm Water Permit.

154.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to collect storm water samples from all discharge locations at the Facility, in violation of Section B(5)(a) of the Storm Water Permit.

155.   Waterkeeper is informed and believes, and thereon alleges, that storm water samples analyzed by the RA Nelson Facility Owners and/or Operators were not collected during the first hour of discharge, as required by Section B(5)(a) of the Storm Water Permit.

156.   Waterkeeper is informed and believes, and thereon alleges, the RA Nelson Facility Owners and/or Operators failed to collect storm water samples from two storm events during every Wet Season that they were operating with Storm Water Permit

1   coverage, in violation of Section B(5)(a) of the Storm Water Permit.

2       157.   Waterkeeper is informed and believes, and thereon alleges, that the RA

3   Nelson Facility Owners and/or Operators fail to analyze storm water samples for all

4   Table D pollutants listed above, as required by Table D of the Storm Water Permit.

5       158.   Waterkeeper is informed and believes, and thereon alleges, that the RA

6   Nelson Facility Owners and/or Operators also have not analyzed storm water samples for

7   pollutants likely to be present in discharges in significant quantities, including

8   *Escherichia coli* and coliform bacteria, as required by Section B(5)(c) of the Storm Water

9   Permit.

10      159.   Waterkeeper is informed and believes, and thereon alleges, that the RA

11  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately

12  develop, implement and/or revise a M&RP in violation of Section B and Provision E(3)

13  of the Storm Water Permit.

14      **H.    Defendants' Failure to Comply with the Storm Water Permit's**

15          **Reporting Requirements.**

16      160.   Waterkeeper is informed and believes, and thereon alleges, that the RA

17  Nelson Facility Owners and/or Operators failed and continue to fail to submit Annual

18  Reports that comply with Section B(14) of the Storm Water Permit.

19      161.   Waterkeeper is informed and believes, and thereon alleges, that the RA

20  Nelson Facility Owners and/or Operators failed and continue to fail to submit Annual

21  Reports signed by a duly authorized representative, as required by Sections B(14), C(9),

22  and C(10) of the Storm Water Permit.

23      162.   Waterkeeper is informed and believes, and thereon alleges, that the RA

24  Nelson Facility Owners' and/or Operators' certifications of compliance with the Storm

25  Water Permit in the Facility's Annual Reports are erroneous because the Facility Owners

26  and/or Operators have not revised the Facility SWPPP and/or BMPs to achieve

27  compliance with the Storm Water Permit, as required by Sections A(9) and A(10) of the

28  Storm Water Permit.

163.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners' and/or Operators' certifications of compliance with the Storm Water Permit in the Facility's Annual Reports are erroneous because the Facility Owners and/or Operators have not submitted complete ACSCE Reports, as required by Sections A(9) and B(14) of the Storm Water Permit.

164.   Waterkeeper is informed and believes, and thereon alleges, that even when the RA Nelson Facility Owners and/or Operators did not certify in an Annual Report that the Facility was in compliance with the Storm Water Permit, they still made erroneous claims in the Annual Report, such as stating that the BMPs and SWPPP were in compliance with the Storm Water Permit when they were not.

165.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to include a summary or evaluation of their visual observations and sampling and analysis results in the Facility's Annual Reports, as required by Section B(14) of the Storm Water Permit.

166.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to include laboratory reports indicating the results of analyses of the Facility's discharges in the Facility's Annual Reports, as required by Section B(14) of the Storm Water Permit.

167.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to describe instances of noncompliance with the Storm Water Permit in the Facility's Annual Reports, and steps taken or planned to prevent recurrence of noncompliance with the Storm Water Permit, as required by Section C(11) of the Storm Water Permit.

168.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators failed and continue to fail to written reports submit to the Regional Board identifying additional BMPs to be implemented at the Facility following the Facility's violations of the Storm Water Permit's Receiving Water Limitations, as required by Receiving Water Limitations C(3) and C(4) of the Storm

Water Permit.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitation B(3) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

169.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

170.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that does not achieve compliance with BAT/BCT standards has discharged and continues to discharge from the RA Nelson Facility.

171.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the RA Nelson Facility occur during every storm water discharge from the RA Nelson Facility.

172.   The RA Nelson Facility Owners and/or Operators violate Effluent Limitation B(3) of the Storm Water Permit each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the RA Nelson Facility.

173.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners' and/or Operators' violations of Effluent Limitation B(3) of the Storm Water Permit and the CWA are ongoing and continuous.

174.   The RA Nelson Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the RA Nelson Facility in violation of Effluent Limitation B(3) of the Storm Water Permit.

175.   Each and every time the RA Nelson Facility Owners and/or Operators discharge contaminated storm water from the RA Nelson Facility in violation of Effluent

1 │ Limitation B(3) of the Storm Water Permit is a separate and distinct violation of section

2 │ 301(a) of the CWA, 33 U.S.C. § 1311(a).

3 │     176.   By committing the acts and omissions alleged above, the RA Nelson Facility

4 │ Owners and/or Operators are subject to an assessment of civil penalties for each and

5 │ every violation of the CWA occurring from 20 October 2008 to the present pursuant to

6 │ sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

7 │     177.   An action for injunctive relief under the CWA is authorized by 33 U.S.C.

8 │ § 1365(a). Continuing commission of the acts and omissions alleged above would

9 │ irreparably harm Plaintiffs and the citizens of the State of California, for which harm

10 │ Waterkeeper has no plain, speedy, or adequate remedy at law.

11 │     WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

12 │ hereafter.

13 │
## SECOND CAUSE OF ACTION

14 │
**Defendants' Discharges of Contaminated Storm Water in Violation of Storm
15 │ Water Permit Receiving Water Limitation C(1) and the Clean Water Act.**
16 │ **33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

17 │     178.   Waterkeeper incorporates the allegations contained in the above paragraphs

18 │ as though fully set forth herein.

19 │     179.   Waterkeeper is informed and believes, and thereon alleges, that storm water

20 │ containing levels of pollutants that adversely impact human health and/or the

21 │ environment has discharged and continues to discharge from the RA Nelson Facility.

22 │     180.   The RA Nelson Facility Owners and/or Operators violate Receiving Water

23 │ Limitation C(1) of the Storm Water Permit each and every time storm water containing

24 │ levels of pollutants that adversely impact human health and/or the environment

25 │ discharges from the RA Nelson Facility.

26 │     181.   Waterkeeper is informed and believes, and thereon alleges, that the RA

27 │ Nelson Facility Owners' and/or Operators' violations of Receiving Water Limitation C(1)

28 │ of the Storm Water Permit and the CWA from the RA Nelson Facility are ongoing.

182.   The RA Nelson Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the RA Nelson Facility in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

183.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

184.   By committing the acts and omissions alleged above, the RA Nelson Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 20 October 2008 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

185.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth hereafter.

### THIRD CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitation C(2) and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

186.   Waterkeeper incorporates the allegations contained in the above paragraph as though fully set forth herein.

187.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the RA Nelson Facility.

188.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of

1 │ water quality standards from the RA Nelson Facility occur during every storm water
2 │ discharge from the RA Nelson Facility.

3 │     189.   The RA Nelson Facility Owners and/or Operators violate Receiving Water
4 │ Limitation C(2) of the Storm Water Permit each and every time storm water containing
5 │ levels of pollutants that cause or contribute to exceedances of water quality standards
6 │ discharges from the RA Nelson Facility.

7 │     190.   Waterkeeper is informed and believes, and thereon alleges, that the RA
8 │ Nelson Facility Owners' and/or Operators' violations of Receiving Water Limitation C(2)
9 │ of the Storm Water Permit and the CWA from the RA Nelson Facility are ongoing.

10 │     191.   The RA Nelson Facility Owners and/or Operators will continue to be in
11 │ violation of the Storm Water Permit and the CWA each and every time contaminated
12 │ storm water discharges from the RA Nelson Facility in violation of Receiving Water
13 │ Limitation C(2) of the Storm Water Permit.

14 │     192.   Each and every violation of Receiving Water Limitation C(2) of the Storm
15 │ Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C.
16 │ § 1311(a).

17 │     193.   By committing the acts and omissions alleged above, the RA Nelson Facility
18 │ Owners and/or Operators are subject to an assessment of civil penalties for each and
19 │ every violation of the CWA occurring from 20 October 2008 to the present pursuant to
20 │ sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

21 │     194.   An action for injunctive relief under the CWA is authorized by 33 U.S.C.
22 │ § 1365(a). Continuing commission of the acts and omissions alleged above would
23 │ irreparably harm Plaintiffs and the citizens of the State of California, for which harm
24 │ Waterkeeper has no plain, speedy, or adequate remedy at law.

25 │     WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth
26 │ hereafter.

27 │ ///
28 │ ///

# FOURTH CAUSE OF ACTION

## Defendants' Discharges of Non-Storm Water in Violation of the Storm Water Permit's Discharge Prohibition A(1) and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

195.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

196.   Waterkeeper is informed and believes, and thereon alleges, that prohibited non-storm water has discharged and continues to discharge from the RA Nelson Facility in violation of Discharge Prohibition A(1) of the Storm Water Permit each time water used for dust control, washing, cleaning, and/or irrigation is not prevented from discharging from the RA Nelson Facility.

197.   Waterkeeper is informed and believe, and thereon alleges, that the RA Nelson Facility Owners' and/or Operators' violations of Discharge Prohibition A(1) are ongoing and continuous.

198.   The RA Nelson Facility Owners and/or Operators will continue to be in violation of the Storm Water Permit and the Clean Water Act each and every time non-storm water discharges from the RA Nelson Facility in violation of Discharge Prohibition (A)(1) and Special Condition D(1) of the Storm Water Permit.

199.   Each and every violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

200.   By committing the acts and omissions alleged above, the RA Nelson Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 20 October 2008 to the present pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

201.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm

1  Waterkeeper has no plain, speedy, or adequate remedy at law.

2        WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth

3  hereafter.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit Section A and Provision E(2) and Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

9        202.   Waterkeeper incorporates the allegations contained in the above paragraphs

10  as though fully set forth herein.

11        203.   Waterkeeper is informed and believes, and thereon alleges, that the RA

12  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately

13  develop a SWPPP for the RA Nelson Facility, in violation of Section A and Provision

14  E(2) of the Storm Water Permit.

15        204.   Waterkeeper is informed and believes, and thereon alleges, that the RA

16  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately

17  implement a SWPPP for the RA Nelson Facility, in violation of Section A and Provision

18  E(2) of the Storm Water Permit.

19        205.   Waterkeeper is informed and believes, and thereon alleges, that the RA

20  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately

21  revise a SWPPP for the RA Nelson Facility, in violation of Sections A(9) and A(10) of

22  the Storm Water Permit.

23        206.   The RA Nelson Facility Owners and/or Operators have been in violation of

24  Section A and Provision E(2) of the Storm Water Permit at the RA Nelson Facility every

25  day from 20 October 2008 to the present.

26        207.   The RA Nelson Facility Owners' and/or Operators' violations of Section A

27  and Provision E(2) of the Storm Water Permit and the CWA at the RA Nelson Facility

28  are ongoing and continuous.

208.   The RA Nelson Facility Owners and/or Operators will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the CWA each and every day the RA Nelson Facility Owners and/or Operators fail to adequately develop, implement, and/or revise the SWPPP for the RA Nelson Facility.

209.   Each and every violation of the Storm Water Permit's SWPPP requirements at the RA Nelson Facility is a separate and distinct violation of the CWA.

210.   By committing the acts and omissions alleged above, the RA Nelson Facility Owners and/or Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from 20 October 2008 to the present, pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

211.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

WHEREFORE, Plaintiffs pray for judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

212.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

213.   Waterkeeper is informed and believes, and thereon alleges, that the RA Nelson Facility Owners and/or Operators have failed and continue to fail to adequately develop an M&RP for the RA Nelson Facility in violation of Section B and Provision E(3) of the Storm Water Permit.

214.   Waterkeeper is informed and believes, and thereon alleges, that the RA

1  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately
2  implement an M&RP for the RA Nelson Facility in violation of Section B and Provision
3  E(3) of the Storm Water Permit.

4      215.  Waterkeeper is informed and believes, and thereon alleges, that the RA
5  Nelson Facility Owners and/or Operators have failed and continue to fail to adequately
6  revise an M&RP for the RA Nelson Facility in violation of Section B and Provision E(3)
7  of the Storm Water Permit.

8      216.  The RA Nelson Facility Owners and/or Operators have been in violation of
9  the Section B and Provision E(3) of the Storm Water Permit at the RA Nelson Facility
10  every day from 20 October 2008 to the present.

11      217.  The RA Nelson Facility Owners' and/or Operators' violations of Section B
12  and Provision E(3) of the Storm Water Permit and the CWA at the RA Nelson Facility
13  are ongoing and continuous.

14      218.  The RA Nelson Facility Owners and/or Operators will continue to be in
15  violation of Section B and Provision E(3) the Storm Water Permit and the CWA each and
16  every day they fail to adequately develop, implement, and/or revise an M&RP for the RA
17  Nelson Facility.

18      219.  Each and every violation of the Storm Water Permit's M&RP requirements
19  at the RA Nelson Facility is a separate and distinct violation of the CWA.

20      220.  By committing the acts and omissions alleged above, the RA Nelson Facility
21  Owners and/or Operators are subject to an assessment of civil penalties for each and
22  every violation of the CWA occurring from 20 October 2008 to the present pursuant to
23  sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

24      221.  An action for injunctive relief under the CWA is authorized by 33 U.S.C.
25  § 1365(a). Continuing commission of the acts and omissions alleged above would
26  irreparably harm Waterkeeper and the citizens of the State of California, for which harm
27  Waterkeeper has no plain, speedy, or adequate remedy at law.

28      WHEREFORE, Plaintiffs pray judgment against the Defendants as set forth

1   hereafter.

2

### SEVENTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

6     222. Waterkeeper incorporates the allegations contained in the above paragraphs

7 as though fully set forth herein.

8     223. Waterkeeper is informed and believes, and thereon alleges, that the RA

9 Nelson Facility Owners and/or Operators have failed and continue to fail to submit

10 accurate Annual Reports to the Regional Board in violation of Sections B(14), C(9),

11 C(10) and C(11) of the Storm Water Permit.

12     224. Waterkeeper is informed and believes, and thereon alleges, that the RA

13 Nelson Facility Owners and/or Operators have failed and continue to fail to submit

14 complete Annual Reports to the Regional Board in violation of Sections B(14), C(9),

15 C(10), and C(11) of the Storm Water Permit.

16     225. The RA Nelson Facility Owners' and/or Operators' violations of the

17 reporting requirements of the Storm Water Permit and the CWA are ongoing and

18 continuous.

19     226. The RA Nelson Facility Owners and/or Operators have been in violation of

20 Sections B(14), C(9), C(10), and C(11) of the Storm Water Permit and the CWA every

21 day since at least 20 October 2008.

22     227. By committing the acts and omissions alleged above, the RA Nelson Facility

23 Owners and/or Operators are subject to an assessment of civil penalties for each and

24 every violation of the CWA occurring from 20 October 2008 to the present pursuant to

25 sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

26     228. An action for injunctive relief under the CWA is authorized by 33 U.S.C.

27 § 1365(a). Continuing commission of the acts and omissions alleged above would

28 irreparably harm Waterkeeper and the citizens of the State of California, for which harm

1  Waterkeeper has no plain, speedy, or adequate remedy at law.

2          WHEREFORE, Plaintiffs pray judgment against the Defendants as set forth

3  hereafter.

4  **VII.     RELIEF REQUESTED**

5          229.   Plaintiffs respectfully request that this Court grant the following relief:

6          a.     A Court order declaring Defendants to have violated and to be in violation

7  of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their

8  discharges of pollutants not in compliance with the Storm Water Permit and violations of

9  the substantive and procedural requirements of the Storm Water Permit;

10         b.     A Court order enjoining Defendants from violating the substantive and

11 procedural requirements of the Storm Water Permit and the Clean Water Act;

12         c.     A Court order enjoining Defendants from discharging pollutants not in

13 compliance with a NPDES permit;

14         d.     A Court order assessing civil monetary penalties for each violation of the

15 CWA at $32,500 per day per violation for violations occurring from 20 October 2008

16 through 12 January 2009, as permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

17         e.     A Court order assessing civil monetary penalties for each violation of the

18 CWA at $37,500 per day per violation for violations occurring since 12 January 2009, as

19 permitted by 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

20         f.     A Court order awarding Plaintiffs their reasonable costs of suit, including

21 attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean

22 Water Act, 33 U.S.C. § 1365(d); and

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

Complaint                                    37

1      g.      Any other relief as this Court may deem appropriate.

2

3    Dated: December 18, 2013                    Respectfully submitted,

4                                                LAWYERS FOR CLEAN WATER, INC.

5

6

7                                                _____
                                                 Daniel Cooper
8                                                Attorney for Plaintiffs
                                                 Inland Empire Waterkeeper and Orange
9                                                County Coastkeeper

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint                              38



Inland Empire Waterkeeper
*Advocacy • Education • Restoration • Enforcement*

6876 Indiana Avenue, Suite D
Riverside, CA 92506
Phone (951) 530-8823
Fax (951) 530-8824
Website www.iewaterkeeper.org

October 8, 2013

**VIA CERTIFIED MAIL**

Burrtec Waste Group, Inc.                Burrtec Waste Industries, Inc.
9890 Cherry Avenue                       9890 Cherry Avenue
Fontana, California 92335                 Fontana, California 92335

RA Nelson MRF Transfer Station           Agua Mansa MRF, LLC
Managing Agent                           13373 Napa Street
1830 Agua Mansa Road                     Fontana, California 92335
Riverside, California, 92509

**VIA U.S MAIL**

Cole Burr                                Cole Burr
Registered Agent                         Registered Agent
Burrtec Waste Group, Inc.                Burrtec Waste Industries, Inc.
9890 Cherry Avenue                       9890 Cherry Avenue
Fontana, California 92335                 Fontana, California 92335

Cole Burr
Registered Agent
Agua Mansa MRF, LLC
9890 Cherry Avenue
Fontana, California 92335

**Re:    Notice of Violation and Intent to File Suit Under the Clean Water Act**

To Whom It May Concern:

      I am writing on behalf of Inland Empire Waterkeeper and Orange County Coastkeeper (collectively "Waterkeeper") in regard to violations of the Clean Water Act[1] and California's Storm Water Permit[2] occurring at 1830 and 1850 Agua Mansa Road in Riverside California ("RA Nelson Facility" or "Facility"). This letter is being sent to you as the responsible owners and/or operators of the RA Nelson Facility, or as the registered agent for those entities. This letter puts Burrtec Waste Group, Inc., Burrtec Waste Industries, Inc., and Agua Mansa MRF, LLC (hereinafter referred to as the "RA Nelson Facility Owners and/or Operators"), on notice of the violations of the Storm Water Permit occurring at the RA Nelson Facility including, but not

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 2 of 18

limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, the RA Nelson Facility Owners and/or Operators are liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that a citizen give notice of his/her intention to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a). Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1).

By this letter issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act, (hereinafter "Notice Letter"), Waterkeeper puts the RA Nelson Facility Owners and/or Operators on notice that, after the expiration of sixty (60) days from the date of this Notice Letter, Waterkeeper intends to file an enforcement action in Federal court against them for violations of the Storm Water Permit and the Clean Water Act.

## I.   BACKGROUND

### A. Inland Empire Waterkeeper and Orange County Coastkeeper

Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506. Inland Empire Waterkeeper is a chapter of Orange County Coastkeeper. Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626. Together, Inland Empire Waterkeeper and Orange County Coastkeeper have over 2,000 members who live and/or recreate in and around San Bernardino County and the Santa Ana River watershed. Inland Empire Waterkeeper and Orange County Coastkeeper are dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of their local watersheds. To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

Members of Waterkeeper use and enjoy the waters into which the RA Nelson Facility discharges into, including the Santa Ana River and its tributaries. Members of Waterkeeper use and enjoy the Santa Ana River and its tributaries to picnic, hike, view wildlife, and engage in scientific study, including monitoring activities, among other things. Procedural and substantive violations of the Storm Water Permit including, but not limited to, the discharge of pollutants from the RA Nelson Facility, impairs each of these uses. Further, these violations are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be adversely affected by the RA Nelson Facility Owners' and/or Operators' failure to comply with the Storm Water Permit and the Clean Water Act.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 3 of 18

## B. The Owners and/or Operators of the RA Nelson Facility

Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Water Resources Control Board ("State Board") to obtain Storm Water Permit coverage. *See* Storm Water Permit, Finding #3. The RA Nelson Facility Owners' and/or Operators' NOI was approved by the State Board on January 14, 2009. Waterkeeper obtained a second NOI from the State Board, dated July 6, 2012, which is unsigned. It identifies the Facility name and location as "RA Nelson MRF Transfer Station, 1830 Agua Mansa Road, 1850 Agua Mansa Road, Riverside," and lists the Facility operator as "Agua Mansa MRF, LLC." The Facility's Waste Discharge Identification ("WDID") number is 8-33I021996.

Information available to Waterkeeper indicates that Agua Mansa MRF, LLC is an owner and/or operator of the RA Nelson Facility. Information available to Waterkeeper indicates that Burrtec Waste Industries, Inc. is also an owner and/or operator of the RA Nelson Facility. Finally, information available to Waterkeeper indicates that Burrtec Waste Group, Inc. an owner and/or operator of the RA Nelson Facility. Burrtec Waste Group, Inc. and Burrtec Waste Industries, Inc. are active corporations registered in California, and Agua Mansa MRF, LLC is an active limited liability company registered in California. The registered agent for all three entities is Cole Burr, 9890 Cherry Avenue in Fontana, California 92335.

The RA Nelson Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the RA Nelson Facility into local waters.

## C. Storm Water Pollution and the Water Receiving the Facility's Discharges

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations such as the RA Nelson Facility pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and adversely impact aquatic-dependent wildlife. These contaminated discharges can and must be controlled for downstream ecosystems to regain their health.

Storm water discharges from waste transfer and recycling facilities like the RA Nelson Facility, contain pollutants such as: Oil & Grease ("O&G"); heavy metals (such as copper, iron, lead, aluminum, and zinc); Total Suspended Solids ("TSS"), nutrients, synthetic organic compounds, pesticides, pathogens, and trash, debris and floatables. Many of these pollutants are on the list of chemicals published by the State of California as known to cause cancer, birth defects, and/or developmental or reproductive harm. Discharges of polluted storm water to the Santa Ana River and its tributaries pose carcinogenic and reproductive toxicity threats to the public and adversely affect the aquatic environment.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 4 of 18

The RA Nelson Facility discharges into the municipal separate storm sewer system ("MS4") operated by the City of Fontana and/or Riverside County, which discharges to the Santa Ana River and its tributaries (collectively "Receiving Waters"). The Santa Ana River is an ecologically sensitive area. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, the Receiving Waters still provide essential habitat for dozens of fish, bird, and invertebrate species. These pollutants harm the special aesthetic and recreational significance that the Receiving Waters has for people in the surrounding communities, including Waterkeeper's members. The public's use of the Receiving Waters for water contact sports exposes people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

The California Regional Water Quality Control Board, Santa Ana Region Regional Board ("Regional Board") issued the *Santa Ana River Basin Water Quality Control Plan* ("Basin Plan"). The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. . The Beneficial Uses for the Santa Ana River near or downstream of the point at which it receives polluted storm water discharges from the RA Nelson Facility (i.e., Santa Ana River Reaches 1 – 4) include: Agricultural Supply; Groundwater Recharge; Water Contact Recreation; Non-contact Water Recreation; Warm Freshwater Habitat; Wildlife Habitat; and Rare, Threatened or Endangered Species. *See* Basin Plan at Table 3-1. According to the 2010 303(d) List of Impaired Water Bodies, Reach 4 of the Santa Ana River is impaired for pathogens; Reach 3 of the Santa Ana River is impaired for copper, lead, and pathogens; and Reach 2 of the Santa Ana River is impaired for indicator bacteria.[1] Polluted discharges from industrial sites, such as the RA Nelson Facility, contribute to the degradation of these already impaired surface waters and aquatic-dependent wildlife.

## II.    THE RA NELSON FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A. RA Nelson Facility Site Description

The RA Nelson Facility Storm Water Pollution Prevention Plan ("SWPPP") states that the Facility is 21.4 acres, over half of which is impervious. The SWPPP describes the Facility as having a Transfer Station Building, located near the center of the site, which is the main building at the Facility. This Transfer Station Building contains a waste transfer station, a material recovery facility, administrative offices, an area used to receive recyclable materials from the public, an area used to receive mixed commercial wastes, and an area used to store hazardous materials. Located adjacent to the northeast side of the Transfer Station Building is an uncovered area used for green waste operations. To the northeast of this green waste area, in the northeast corner of the Facility, is an uncovered area used for food waste and green waste composting. Located adjacent to the south and southeast sides of the Transfer Station Building is an uncovered construction debris area, and located along the southeast side of the Transfer Station Building is a ramp and a waste transfer tunnel. There are two points of ingress/egress from the Facility to Agua Mansa Road, referred to in this Notice Letter as "Driveway 1" and "Driveway 2." Driveway 1 is located along to the north of the main employee parking lot, and Driveway 2 is

Notice of Violation and Intent to File Suit
October 8, 2013
Page 5 of 18

located to the south of the main employee parking lot. The southwestern corner of the Facility is
used for vehicle maintenance, cleaning operations, and storage. Located in this area is a vehicle
maintenance building, and an uncovered area used for equipment and vehicle parking is located
to the east and southeast of the maintenance building. Uncovered scales and an uncovered
fueling island are also located to the southeast of the truck maintenance building.

## B. RA Nelson Facility Industrial Activities and Associated Pollutants

According to the RA Nelson Facility SWPPP, the Facility is a waste disposal, transfer
and recycling facility. The Facility accepts municipal solid waste, recyclable materials, green and
wood wastes, and construction and demolition debris. These materials are sorted at the Facility.
Recyclable materials are separated from other waste and sold, organic materials are processed
into soil amendments, and the remaining materials are transported to a landfill. Vehicle and
equipment maintenance, cleaning operations, and refueling are also conducted at the Facility.

The RA Nelson Facility Owners' and/or Operators' industrial activities are pollutant
sources and include, but are not limited to: processing, loading, and unloading of solid waste and
recyclable materials such as hazardous materials, green/wood waste and construction/demolition
materials; green waste grinding; production of soil amendment from green wastes; storage of
solid waste materials including, but not limited to, household hazardous materials; vehicle and
equipment cleaning operations; vehicle and equipment refueling; vehicle and equipment
maintenance; storage of materials associated with equipment and vehicle maintenance; and
storage of vehicles and equipment. The RA Nelson Facility Owners and/or Operators also store
and/or generate hazardous wastes such as oil, hydraulic fluid, brake fluid, and antifreeze.

The 2009 and 2012 NOI for the RA Nelson Facility listed the Standard Industrial
Classification ("SIC") Code for the Facility as 4212. However, the RA Nelson Facility SWPPP,
which is dated 2010 and 2013, lists the following SIC Codes for the Facility: 4953 (Hazardous
Waste Treatment Storage or Disposal), 4212 (Local Trucking Without Storage), and 5093 (Scrap
and Waste Materials). Facilities classified under SIC Codes 4953 and 5093 require Storm Water
Permit coverage for the entire facility. Even if the RA Nelson was only classified as SIC Code
4212, the Storm Water Permit requires coverage for the entire Facility. For facilities classified as
SIC Code 4212, the Storm Water Permit requires permit coverage for "vehicle maintenance
shops, equipment cleaning operations, or airport deicing operations." Storm Water Permit,
Attachment 1. The Storm Water Permit regulates the portions of the facility which are used for
"vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and
lubrication) or other operations identified herein that are associated with industrial activity."
Storm Water Permit, Attachment 1; *see also* Storm Water Permit, Attachment 4 (stating that
"storm water associated with industrial activity" includes storm water discharges from material
handling activities and storage areas for material handling equipment). Waterkeeper puts the RA
Nelson Facility Owners and/or Operators on notice that one or more of these regulated activities
is conducted at locations throughout the entire RA Nelson Facility, and thus the entire Facility
requires Storm Water Permit coverage. In addition, even if the regulated industrial activities are
not occurring throughout the entire Facility at all times, under the Storm Water Permit's
definition of "storm water associated with industrial activities" and explanation of material

Notice of Violation and Intent to File Suit
October 8, 2013
Page 6 of 18

handling activities, Waterkeeper puts the RA Nelson Facility Owners and/or Operators on notice that since no best management practices ("BMPs") or other controls exist to separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities, storm water at the Facility commingles and thus, all storm water discharges from the Facility are regulated under the Storm Water Permit.

The pollutants associated with operations at the RA Nelson Facility include, but are not limited to: O&G; heavy metals (such as copper, iron, lead, aluminum, and zinc); TSS, nutrients, synthetic organic compounds, pesticides, pathogens, and trash. Information available to Waterkeeper indicates that solid waste sorting and storage, vehicle fueling, vehicle and equipment storage, and other industrial activities occur at the RA Nelson Facility outdoors without adequate cover or other BMPs to prevent storm water and non-storm water exposure to pollutant sources, and without secondary containment or other BMPs to prevent polluted storm water and non-storm water from discharging from the RA Nelson Facility. Thus, the RA Nelson Facility Owners and/or Operators have not properly developed and/or implemented the required BMPs to address pollutant sources and contaminated discharges. Consequently, during rain events storm water carries pollutants from the Facility's uncovered waste storage and sorting areas, contaminated ground and floors, equipment, washing areas, refueling areas, and other areas into the storm sewer system, which flows into the Receiving Waters, in violation of the Storm Water Permit. The lack of adequate BMPs also results in non-storm water discharges. The resulting illegal discharges of polluted water impact Waterkeeper's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

Information available to Waterkeeper also indicates that oil, grease, and other pollutants have been and continue to be tracked from vehicle maintenance and equipment washing areas throughout the Facility. These pollutants accumulate at the vehicle and equipment storage areas, the loading and unloading areas, and the driveways leading onto Agua Mansa Road, and other egress and entranceways at the Facility. There are no BMPs, or inadequate BMPs, to prevent tracking. As a result, trucks and vehicles leaving the Facility via the Facility's access roads and driveways are pollutant sources tracking sediment, dirt, O&G, metal particles, and other pollutants off-site.

## C. RA Nelson Facility Storm Water Flow and Discharge Locations

The RA Nelson Facility SWPPP and site map divide the Facility into eleven "drainage areas" identified as Area A through Area K. These areas are described in the SWPPP as follows:

- Area A consists of 4.1 paved acres in the soil amendment production area in the northeast corner of the Facility;
- Area B consists of 3.6 paved acres used for green waste processing to the northeast of the Transfer Station Building, as well as part of an area of land owned by the County, which drains onto the RA Nelson Facility;
- Area C consists of 3.7 acres that include portions of the Transfer Station Building roof, paved driveways and loading and unloading areas around the building, and

Notice of Violation and Intent to File Suit
October 8, 2013
Page 7 of 18

paved green waste processing areas to the south and east of the Transfer Station Building;

- Area D consists of 1.8 acres, comprised primarily of the Transfer Station Building's roof, as well as the transfer tunnel and associated ramp that are adjacent to the southeastern side of the building;
- Area E consists of 2.8 acres of pavement to the west of the Transfer Station Building that is used for truck parking, and where scales and a portion of the fueling island are located;
- Area F consists of 0.5 acres made up of the vehicle maintenance-building roof, the adjoining employee parking lot and a portion of the fuel island;
- Area G consists of 1.1 paved acres that include portions of the scale area and employee parking lot;
- Area H consists of 0.2 acres comprised of a portion of the employee parking lot;
- Area I consists of 1.6 paved acres, also comprised of a portion of the employee parking lot;
- Area J consists of 0.2 acres of the maintenance-building roof; runoff from this area is discharged into a landscaped area to the north of the building; and
- Area K consists of a 0.03-acre area within the maintenance building and truck wash bay.

Storm water from each of these drainage areas discharges to Receiving Waters via discharge points located throughout the Facility. The SWPPP claims that "fluids" within the maintenance building and truck wash bay are "captured within the facility and discharged into industrial clarifiers that are connect to the sanitary sewer system."

The Facility's 2012-2013 Annual Report indicates that there are at least six discharge points at the RA Nelson Facility. The SWPPP site map identifies four "SD inlet[s]" and "MP #1" monitoring point 2 ("MP #2") which is located approximately 300 feet to the east of MP #1, along the southern boundary of the Facility; monitoring point 3 ("MP #3"), which is located near the middle of the southeast boundary of the Facility; and monitoring point 4 ("MP #4"), which is located to the north of MP #3, along the eastern boundary of the Facility. Information available to Waterkeeper indicates that there are at least seven additional discharge points at the Facility including, but not limited to: the northern curb of Driveway 1, along which water flows to Agua Mansa Road; the southern curb of Driveway 1, along which water flows to Agua Mansa Road; the northern curb of Driveway 2, along which water flows to Agua Mansa Road; the southern curb of Driveway 2, along which water flows to Agua Mansa Road; and three drain outlets along Agua Mansa Road (not including the MP #1 outlet).

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMIT

### A. Discharges of Polluted Storm Water from the RA Nelson Facility in Violation of Effluent Limitation B(3) of the Storm Water Permit

Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers to reduce or

Notice of Violation and Intent to File Suit
October 8, 2013
Page 8 of 18

prevent pollutants associated with industrial activity in storm water discharges through implementation of BMPs that achieve best available technology economically achievable ("BAT") for toxic pollutants[3] and best conventional pollutant control technology ("BCT") for conventional pollutants.[4] EPA's Industrial Storm Water Permit contains benchmark values, which are objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT, as required by Effluent Limitation B(3) of the Storm Water Permit ("EPA Benchmarks").[5]

Storm water sampling at the RA Nelson Facility demonstrates that concentrations of pollutants in storm water discharges from the Facility exceed applicable EPA Benchmarks. Attachment A contains a table with the dates on which storm water samples reported by RA Nelson Facility Owners and/or Operators since the 2009–2010 Annual Report exceed an EPA Benchmark.

The repeated exceedances of EPA Benchmarks demonstrate that the RA Nelson Facility Owners and/or Operators have failed to develop and/or implement required BMPs that achieve compliance with the BAT/BCT standards. Waterkeeper puts the RA Nelson Facility Owners and/or Operators on notice that they violate Effluent Limitation B(3) of the Storm Water Permit each time they discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards, including, but not limited to, the dates identified in Attachment A. These violations are ongoing and will continue every time the RA Nelson Facility Owners and/or Operators discharge polluted storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Waterkeeper will update the dates of violations when additional information and data become available. Each time that the RA Nelson Facility Owners and/or Operators discharge polluted storm water in violation of Effluent Limitation (B)(3) of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The RA Nelson Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since industrial operations began, which appears to be since at least January 14, 2009.

### B. Discharges of Polluted Storm Water from the RA Nelson Facility in Violation of Receiving Water Limitations C(1) and C(2) of the Storm Water Permit

Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface water or groundwater that adversely impact human health or the environment. Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment constitute violations of Receiving Water Limitation C(1) of the Storm Water Permit and the

---

[3] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.
[4] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include BOD, TSS, O & G, pH, and fecal coliform.
[5] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective May 27, 2009 ("Multi-Sector Permit"), Fact Sheet at 106; *see also*, 73 Federal Register 56572 (2008).

Notice of Violation and Intent to File Suit
October 8, 2013
Page 9 of 18

Clean Water Act. Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable Water Quality Standard ("WQS").[6] Applicable WQSs include, among others, the Criteria for Priority Toxic Pollutants in the State of California, 40 C.F.R. § 131.38 ("CTR"). The Basin Plan sets out additional WQSs, including WQSs for total coliform and fecal coliform when the Beneficial Uses of a lake or stream include Municipal and Domestic Supply, Non-contact Water Recreation, and Water Contact Recreation, such as the Receiving Waters. Discharges that contain pollutants in excess of an applicable WQS violate Receiving Water Limitation C(2) of the Storm Water Permit and the Clean Water Act.

Information available to Waterkeeper indicates that storm water discharges from the RA Nelson Facility contain elevated concentrations of pollutants such as copper, lead, zinc, and pathogens, including coliform bacteria and *Escherichia coli,* among others. The Receiving Waters are impaired for copper, lead, and pathogens. Information available to Waterkeeper indicates that storm water discharges from the RA Nelson Facility containing elevated concentrations of pollutants can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters. Information available to Waterkeeper further indicates that storm water discharges from the RA Nelson Facility containing elevated concentrations of pollutants cause or contribute to a violation of an applicable WQS. Attachment A contains a table with the dates on which storm water discharges from the Facility since the 2008-2009 Wet Season exceed CTR WQSs.

The repeated exceedances of WQSs demonstrate that the RA Nelson Facility Owners and/or Operators have violated and continue to violate Receiving Water Limitation C(1) and/or Receiving Water Limitation C(2). Waterkeeper puts RA Nelson Facility Owners and/or Operators on notice that they violate Receiving Water Limitation C(1) and/or Receiving Water Limitation C(2) each time storm water discharges from the Facility containing pollutants that adversely affect human health or the environment and/or cause or contribute to a violation of an applicable WQS including, but not limited to, the dates identified in Attachment A. Each time that discharges of storm water from the RA Nelson Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation C(1) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time that discharges of storm water from the RA Nelson Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation C(2) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These discharge violations are ongoing and Waterkeeper will update the dates of violation when additional information and data becomes available. The RA Nelson Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since industrial operations began, which appears to be since at least January 14, 2009.

---

[6] WQS include pollutant concentration levels determined by the State Water Resources Control Board and the EPA to be protective of the Beneficial Uses of receiving waters. Discharges above WQS contribute to the impairment of the receiving waters' Beneficial Uses.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 10 of 18

**C. Unauthorized and Authorized Non-Storm Water Discharges from the RA Nelson Facility in Violation of Discharge Prohibition A(1) of the Storm Water Permit**

Except as authorized by Special Conditions D(1) of the Storm Water Permit, Discharge Prohibition A(1) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition A(1).

Information available to Waterkeeper indicates that non-storm water discharges from the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. Information available to Waterkeeper indicates that unauthorized non-storm water discharges occur at the Facility from dust control and/or when washing and cleaning activities occur without BMPs to prevent the discharge. These non-storm water discharges are not from sources that are listed among the authorized non-storm water discharges in Special Conditions D(1) of the Storm Water Permit and thus are always prohibited without a separate NPDES permit. Information available to Waterkeeper indicates that the RA Nelson Facility Owners and/or Operators have not obtained a separate NPDES permit for the Facility's unauthorized non-storm water discharges, as thus these discharges are in violation of Discharge Prohibition A(1) of the Storm Water Permit.

Certain non-storm water discharges are allowed, such as fire hydrant flushing, drinking fountain water, and landscape watering, only if all requirements under Special Conditions D(1) of the Storm Water Permit are met. Special Conditions D(1) requires, among other things, the development and implementation of BMPs, which must be specifically listed in the SWPPP, to prevent or reduce the contact of non-storm water discharges with significant materials or equipment. The non-storm water discharges also cannot contain significant quantities of pollutants. The RA Nelson Owners and/or Operators consistently report non-storm water observations of irrigation drainage at the Facility (*see e.g.* Annual Reports from 2009-2010 to 2012-2013), which are not "authorized," because the RA Nelson Facility Owners and/or Operators have not developed or implemented the required BMPs to prevent pollutant exposure to the non-storm water, and are not otherwise in compliance with Special Conditions D(1). These non-storm water discharges are not authorized by a separate NPDES permit or subject to Special Condition D(1). Therefore, the RA Nelson Facility Owners and/or Operators are in violation of Discharge Prohibition A(1) for these non-storm water discharges.

Waterkeeper puts the RA Nelson Facility Owners and/or Operators on notice that Discharge Prohibition A(1) of the Storm Water Permit is violated each time non-storm water is discharged from the RA Nelson Facility. These discharge violations are ongoing and will continue until the RA Nelson Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges, or obtain separate NPDES permit coverage. Each time the RA Nelson Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition A(1) of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33

U.S.C. § 1311(a). The RA Nelson Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act since industrial operations began, which appears to be since at least January 14, 2009.

### D. Failure to Develop, Implement and/or Revise an Adequate Storm Water Pollution Prevention Plan

Section A(1) and Provision E(2) of the Storm Water Permit requires dischargers to have developed and implemented a SWPPP by October 1, 1992, or prior to beginning industrial activities, that meets all of the requirements of the Storm Water Permit. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, and to implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges. Storm Water Permit, Section A(2). These BMPs must achieve compliance with the Storm Water Permit's Effluent Limitations and Receiving Water Limitations. To ensure compliance with the Storm Water Permit, the SWPPP must be evaluated on an annual basis pursuant to the requirements of Section A(9). The SWPPP must also be revised as necessary to ensure compliance with the Storm Water Permit. *Id.,* Sections A(9) and A(10).

Sections A(3) – A(10) of the Storm Water Permit set forth the requirements for a SWPPP. Among other information, the SWPPP must include: identification of individual(s) and their responsibilities in developing, implementing, and revising the facility's SWPPP (*see* Storm Water Permit Section A(3)(a)); a site map with information including storm water drainage areas with flow patterns, nearby water bodies, and the location of the storm water collection and conveyance system and associated points of discharge (*see id.,* Section A(4)); and a list of significant materials handled and stored at the facility (*see id.,* Section A(5)). Sections A(7) and A(8) require an assessment of potential pollutant sources at the facility and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.

Information available to Waterkeeper indicates that the RA Nelson Facility Owners and/or Operators have been conducting and continue to conduct operations at the RA Nelson Facility with an inadequately developed, implemented, and/or revised SWPPP. For example, the RA Nelson Facility Owners and/or Operators have failed and continue to fail to revise the SWPPP as necessary to develop and implement adequate BMPs to prevent the discharge of polluted storm water from the RA Nelson Facility. Storm water is discharged from the RA Nelson Facility containing concentrations of pollutants above applicable EPA Benchmarks and/or WQSs – in some cases, many times the applicable limit – evidencing that RA Nelson Facility Owners and/or Operators have inadequately developed and/or implemented BMPs at the RA Nelson Facility. In addition, pollutants are observed in storm water discharges, and the need for additional BMPs is noted in Annual Reports, but the SWPPP has not been revised to address these deficiencies. Thus, the SWPPP does not comply with Section A of the Storm Water Permit.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 12 of 18

Second, the SWPPP fails to include the information required by Section A. For example, the RA Nelson Facility SWPPP indicates that a list of significant materials that may come into contact with storm water is included in Worksheet No. 2 in Appendix B of the SWPPP. However, the Worksheet No. 2 attached to the SWPPP is blank. Therefore, the RA Nelson Facility Owners and/or Operators failed to include in their SWPPP a list of significant materials handled and stored at the Facility, as required by Section A(5) of the Storm Water Permit. The SWPPP also fails to include the employees responsible for Storm Water Permit compliance, in violation of Section A(3) of the Storm Water Permit.

The SWPPP also fails to include an adequate site map that includes all of the requirements of Section A(4) of the Storm Water Permit. For example, the site map fails to identify all discharge points associated with the storm water collection and conveyance system. Further, the SWPPP states that approximately half the site is unpaved, yet the site map fails to include any areas of soil erosion. An inadequate site map is a violation of Section A(4) of the Storm Water Permit.

These examples of the deficiencies in the SWPPP demonstrates that the RA Nelson Facility Owners and/or Operators have failed to develop, implement and/or revise a SWPPP that complies with the requirements of Section A and Provision E(2) of the Storm Water Permit. The RA Nelson Facility Owners and/or Operators have been, and will continue to be, in violation of the SWPPP requirements each day they operate with an inadequately developed, implemented, and/or revised SWPPP. Every day that the RA Nelson Facility Owners and/or Operators operate the Facility with an inadequately developed, implemented, and/or revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. These violations are ongoing and Waterkeeper will update the number of violations throughout this enforcement action. The RA Nelson Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since industrial operations began, which appears to be since at least January 14, 2009.

### E. Failure to Develop, Implement, and/or Revise an Adequate Monitoring and Reporting Program

Section B(1) and Provision E(3) of the Storm Water Permit requires facility operators to develop and implement a monitoring and reporting plan ("M&RP") by October 1, 1992, or prior to the commencement of industrial activities at a facility, that meets all of the requirements of the Storm Water Permit. The primary objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section B(2). The M&RP must therefore ensure that BMPs are effective, and are evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. Dischargers must revise and update the M&RP to reflect current BMPs, and as otherwise required by the Storm Water Permit. *See id., see also id.,* Section B(4).

Sections B(3) – B(16) of the Storm Water Permit set forth the M&RP requirements. Specifically, Section B(3) requires dischargers to conduct quarterly visual observations of all

Notice of Violation and Intent to File Suit
October 8, 2013
Page 13 of 18

drainage areas within their facility for the presence of authorized and unauthorized non-storm water discharges. Section B(4) requires dischargers to conduct visual observations of storm water discharges during the first hour of discharge at each discharge point of at least one storm event per month during the Wet Season.[7] Sections B(3) and B(4) further require dischargers to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor and the source of any pollutants when conducting observations. Dischargers must maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges. *Id.*, Sections B(3) and (4).

Sections B(5) and B(7) of the Storm Water Permit require dischargers to collect samples of storm water discharges from all locations where storm water is discharged. Under Section B(5) of the Storm Water Permit, the RA Nelson Facility Owners and/or Operators are required to collect at least two samples from each discharge point each Wet Season, including one sample from the first storm event of the Wet Season. These samples must be taken during the first hour of discharge. Storm water samples shall be analyzed for TSS, pH, specific conductance, and total organic carbon or O&G. Storm Water Permit, Section B(5)(c)(i). These samples shall also be analyzed for toxic pollutants and other pollutants that are likely to be present in storm water discharges in significant quantities. *Id.*, Section B(5)(c)(ii). Finally, the RA Nelson Facility is classified as SIC Codes 4953 and 5093, so its storm water samples must also be analyzed for: Ammonia (NH3), Magnesium (Mg), Chemical Oxygen Demand (COD), Arsenic (As), Cadmium (Cd), Cyanide (CN), Lead (Pb), Mercury (Hg), Selenium (Se), Silver (Ag); Zinc (Zn), Copper (Cu), Aluminum (Al), and iIron (Fe). *See id.,* Section B(5)(c)(iii); *see also id.,* Table D.

The RA Nelson Facility Owners and/or Operators have been conducting operations at the RA Nelson Facility with an inadequately developed, implemented, and/or revised M&RP. For example, the RA Nelson Facility Owners and/or Operators fail to analyze storm water samples for all Table D pollutants listed above. The RA Nelson Facility Owners and/or Operators also have not analyzed their samples for pollutants likely to be present in discharges in significant quantities. Information available to Waterkeeper indicates that pathogens, including *Escherichia coli* and coliform bacteria, are likely to be present in significant quantities in storm water discharges from the Facility. However, the RA Nelson Facility Owners and/or Operators have not analyzed the Facility's storm water samples for these, or any, pathogens. The failure to sample as required is a violation of Section B(5)(c) of the Storm Water Permit. In addition, because of this failure to sample for all required parameters, the RA Nelson Owners and/or Operators could not fully assess the adequacy of BMPs at the site intended to prevent exposure of storm water to pollutants and the subsequent discharge of polluted storm water from the Facility.

Since obtaining Storm Water Permit coverage in January 2009, the RA Nelson Facility Owners and/or Operators have never sampled storm water from each discharge point. For example, the RA Nelson Facility Owners and/or Operators report that there are at least 6 discharge points at the Facility but they only collect samples from two discharge points. The RA

---

[7] The Wet Season is defined as October 1 – May 30.

Notice of Violation and Intent to File Suit
October 8, 2013
Page 14 of 18

Nelson Facility Owners and/or Operators also consistently fail to collect a sample during the first hour of discharge. Additionally, the RA Nelson Facility Owners and/or Operators failed to sample two storm events in the 2010-2011 Wet Season. Finally, RA Nelson Facility Owners and/or Operators failed to sample the first rain event of the 2009-2010 Wet Season. Therefore, the RA Nelson Facility Owners and/or Operators have repeatedly violated Section B(5)(a) for failing to sample as required.

The RA Nelson Facility Owners and/or Operators also fail to conduct the quarterly visual observations of unauthorized discharges as required by Section B(3) of the Storm Water Permit. For example, the RA Nelson Facility Owners and/or Operators failed to conduct any visual observations of unauthorized non-storm water discharges for the 2009-2010 Annual Report, failed to conduct the required observations in the 1st, 2nd, and 3rd quarters for the 2010-2011 Annual Report, and failed to conduct the required observations in the 2nd quarter of the 2012-2013 Annual Report. Even the quarterly observations that were conducted were incomplete and the information required by the Storm Water Permit was not included in the Annual Reports.

Additionally, the RA Nelson Facility Owners and/or Operators fail to conduct visual observations of authorized non-storm water discharges as required by Section B(3) of the Permit. For example, the RA Nelson Facility Owners and/or Operators failed to report any visual observations of authorized non-storm water discharges in the 2009-2010 and 2011-2012 Annual Reports. In the 2010-2011 Annual Report, no observations were reported in the 3rd quarter, and in the other three quarters, the RA Nelson Facility Owners and/or Operators indicated that they observed discharges, but did not report the location, source, or a description of these discharges. Similarly, no observations were reported for the 2nd quarter in the 2012-2013 Annual Report, and the other quarters fail to contain the information required by the Storm Water Permit. Because the RA Nelson Facility Owners and/or Operators fail to take visual observations of unauthorized and authorized non-storm water discharges as required, they also failed to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor or the source of any pollutants, in violation of Section B(3) of the Storm Water Permit.

Finally, in violation of Section B(4), the RA Nelson Facility Owners and/or Operators fail to conduct all monthly storm water discharge visual observations during the Wet Season. Specifically, in the Facility's 2009-2010 and 2010-2011 Annual Reports no monthly visual observations of storm water discharges were reported. When observations were reported, they were not done for each discharge location and not within the first hour of the discharge. When the RA Nelson Facility Owners and/or Operators fail to take visual observations of storm water discharges as required, they also fail to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, in violation of Section B(4) of the Storm Water Permit.

The RA Nelson Facility Owners' and/or Operators' failure to conduct sampling and monitoring as required by the Storm Water Permit demonstrates that they have failed to develop, implement, and/or revise an M&RP that complies with the requirements of Section B and Provision E(3) of the Storm Water Permit. The RA Nelson Facility Owners and/or Operators have been, and will continue to be, in violation of the M&RP requirements each day they operate

Notice of Violation and Intent to File Suit
October 8, 2013
Page 15 of 18

with an inadequately developed, implemented, and/or revised M&RP. Every day that the RA Nelson Facility Owners and/or Operators conduct operations with an inadequately developed, implemented, and/or revised M&RP, is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. These violations are ongoing and Waterkeeper will update the number of violations throughout this enforcement action. The RA Nelson Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since industrial operations began, which appears to be since at least January 14, 2009.

## F. Failure to Comply with the Storm Water Permit's Reporting Requirements

Section B(14) of the Storm Water Permit requires a permittee to submit an Annual Report to the Regional Board by July 1 of each year. The Storm Water Permit, in relevant part, requires that the Annual Report include the following: 1) a summary of visual observations and sampling results, 2) an evaluation of the visual observation and sampling and analysis results and the laboratory reports; and 3) the Annual Comprehensive Site Compliance Evaluation Report. Section B(14). As part of the Annual Comprehensive Site Compliance Evaluation, the facility operator shall review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed. *See* Storm Water Permit Section A(9). The Annual Report shall be signed and certified by a responsible corporate officer, or a duly authorized representative,[8] under penalty of law that the information submitted is true, accurate, and complete to the best of their knowledge. *See* Storm Water Permit, Sections B(14), C(9), and C(10).

The RA Nelson Facility Owners and/or Operators fail to submit Annual Reports that comply with the Storm Water Permit reporting requirements. For example, the RA Nelson Facility Owners and/or Operators certify in their Annual Reports that: (1) a complete Annual Comprehensive Site Compliance Evaluation ("ACSCE") was done pursuant to Section A(9) of the Storm Water Permit; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the Storm Water Permit, or will otherwise be revised to achieve compliance. However, information available to Waterkeeper indicates that when these certifications were made they were erroneous because an ACSCE that complies with the Storm Water Permit was not conducted, the SWPPP was not evaluated as required, and/or because the BMPs were not evaluated or revised as required. In addition, the Annual Report's Form 5, which is used to record the information collected when conducting the required ACSCE, is blank. Moreover, none of the Annual Reports are signed, indicating that the required ACSCE was not conducted, and that the information in the Annual Reports has not been certified as required. Finally, although in the 2009-2010 and 2010-2011 Annual Reports the RA Nelson Facility Owners and/or Operators declined to certify compliance with the Storm Water Permit, (*see* Section J in Annual Reports), they also answered Yes to all questions in Section H: ACSCE Checklist, such as agreeing that the BMPs and SWPPP are up to date and in compliance with the

---

[8] Section C(9) lists the requirements for a corporation to delegate responsibility to a "duly authorized representative," which includes, among other things, the requirement that the individual(s) be identified in the SWPPP. Storm Water Permit, Section C(9)(b)(1).

Notice of Violation and Intent to File Suit
October 8, 2013
Page 16 of 18

Storm Water Permit, despite the numerous instances of noncompliance during these Wet
Seasons, as described above.

The RA Nelson Facility Owners and/or Operators have also submitted incomplete
Annual Reports. For example, the laboratory reports of sample analysis have not been submitted,
and many of the Annual Report forms are blank and thus do not record the information required
by the Storm Water Permit. Further, when the RA Nelson Facility Owners and/or Operators
indicate that the Facility does not comply with the Storm Water Permit, they are required to
attach an explanation of this noncompliance and how it will be remedied. Specifically, the
facility operator must report any noncompliance at the time that the Annual Report is submitted,
including 1) a description of the noncompliance and its cause, 2) the period of noncompliance
and, if the noncompliance has not been corrected, the anticipated time it is expected to continue,
and 3) steps taken or planned to reduce and prevent recurrence of the noncompliance. Storm
Water Permit, Section C(11)(d). However, the required explanations are not included in the
Annual Reports. For example, a lack of trained staff is given as the explanation for failing to
conduct the required observations in the 2012-2013 Annual Report, but nothing is proposed to
prevent this from happening again.

Finally, the Storm Water Permit requires a permittee whose discharge exceeds the Storm
Water Permit Receiving Water Limitations to submit a written report identifying what additional
BMPs will be implemented to achieve water quality standards. Storm Water Permit, Receiving
Water Limitations C(3) and C(4). Information available to Waterkeeper indicates that the RA
Nelson Facility Owners and/or Operators have failed to submit the reports required by Receiving
Water Limitations C(3) and C(4) of the Storm Water Permit. As such, the RA Nelson Facility
Owners and/or Operators are in daily violation of this requirement of the Storm Water Permit.

Each of the failures to report as required is a violation of the Storm Water Permit, and
indicates a continuous and ongoing failure to comply with the Storm Water Permit's reporting
requirements. The RA Nelson Facility Owners and/or Operators have been, and will continue to
be, in daily and continuous violation of the Storm Water Permit's reporting requirements until
their reporting complies with the Permit. Every day that the RA Nelson Facility Owners and/or
Operators operate the RA Nelson Facility without reporting as required by the Storm Water
Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the
Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and Waterkeeper will
update the number of violations throughout this enforcement action. The RA Nelson Facility
Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act
occurring since January 14, 2009.

## IV.    RELIEF AND PENALTIES SOUGHT FOR VIOLATIONS OF THE CLEAN
WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the
Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of
the Clean Water Act subjects the violator to a penalty for all violations occurring during the
period commencing five years prior to the date of a notice of intent to file suit letter. These

Notice of Violation and Intent to File Suit
October 8, 2013
Page 17 of 18

provisions of law authorize civil penalties of up to $37,500 per day per violation for all Clean Water Act violations after January 12, 2009. In addition to civil penalties, Waterkeeper will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Waterkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## V.    CONCLUSION

Waterkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. However, upon expiration of the 60-day notice period, Waterkeeper will file a citizen suit under Section 505(a) of the Clean Water Act for the RA Nelson Facility Owners' and/or Operators' violations of the Storm Water Permit. Please direct all communications to Waterkeeper's legal counsel:

> Daniel Cooper
>     daniel@lawyersforcleanwater.com
> Layne Friedrich
>     layne@lawyersforcleanwater.com
> Lawyers for Clean Water, Inc.
> 1004-A O'Reilly Avenue
> San Francisco, California 94129
> Tel: (415) 440-6520

Sincerely,

Garry Brown
Executive Director
Orange County Coastkeeper

Notice of Violation and Intent to File Suit
October 8, 2013
Page 18 of 18

## SERVICE LIST

<u>VIA U.S. MAIL</u>

Gina McCarthy
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Thomas Howard
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812

Kurt Berchtold
Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, California 92501

**Attachment A: Table of Storm Water Sampling Data at the RA Nelson Facility Demonstrating Storm Water Permit Violations**

| Sampling Date | Sampling Location[1] | Parameter | Sample Result | Units | Benchmark[2] | Magnitude of Benchmark Exceedance | CTR Criteria, if exceeded[3,4] |
|---|---|---|---|---|---|---|---|
| 4/5/10 | North Side | Aluminum | 12.0 | mg/L | 0.75 | 16 | |
| 4/5/10 | North Side | Copper | 0.096 | mg/L | 0.0123 | 7.8 | 0.014 |
| 4/5/10 | North Side | Iron | 16.0 | mg/L | 1.0 | 16 | |
| 4/5/10 | North Side | Lead | 0.071 | mg/L | 0.069 | 1.03 | |
| 4/5/10 | North Side | TOC | 810 | mg/L | 110 | 7.36 | |
| 4/5/10 | North Side | TSS | 410 | mg/L | 100 | 4.1 | |
| 4/5/10 | North Side | Zinc | 0.6 | mg/L | 0.11 | 5.45 | 0.12 |
| 4/5/10 | South Side | Aluminum | 16.0 | mg/L | 0.75 | 2.33 | |
| 4/5/10 | South Side | Copper | 0.16 | mg/L | 0.0123 | 13 | 0.014 |
| 4/5/10 | South Side | Iron | 22.0 | mg/L | 1.0 | 22 | |
| 4/5/10 | South Side | Lead | 0.21 | mg/L | 0.069 | 3.04 | 0.082 |
| 4/5/10 | South Side | O&G | 37 | mg/L | 15 | 2.47 | |
| 4/5/10 | South Side | SC | 1000 | umhos/cm | 200 | 5 | |
| 4/5/10 | South Side | TOC | 2400 | mg/L | 110 | 21.82 | |
| 4/5/10 | South Side | TSS | 1300 | mg/L | 100 | 13 | |
| 10/1/10 | North Side | Aluminum | 18.0 | mg/L | 0.75 | 24 | |
| 10/1/10 | North Side | COD | 1700 | mg/L | 120 | 14.17 | |

[1] The RA Nelson Facility Owners and/or Operators use inconsistent terms in their Annual Reports and their SWPPP to identify sampling locations. Neither the SWPPP nor the Annual Reports include descriptions of where samples were taken.
[2] Copper and zinc are water hardness dependent. The EPA Benchmarks listed in this table are based on a hardness of 75-100 mg/L. *See* Multi-Sector Permit, pp. 89 and 102 (Subsector K and N Benchmark Values).
[3] The CTR criteria for "priority toxic pollutants" are set forth in 40 C.F.R. § 131.38. These criteria are expressed as dissolved metal concentrations in the CTR. However, the Storm Water Permit requires permittees to report their sample results as total metal concentrations. *See* Storm Water Permit, Section B(10)(b). In order to compare the sample results reported in the Jack's Disposal Facility's Annual Reports with the CTR criteria, Waterkeeper used the CTR criteria converted to total metal concentrations set forth in the State Board's "Water Quality Goals" database, available at http://www.waterboards.ca.gov/water_issues/programs/water_quality_goals/. The formula used to convert the CTR criteria to total metal concentrations is set forth in the CTR at 40 C.F.R. § 131.38(b)(2)(i).
[4] WQS for copper and zinc are hardness dependent. The CTR criteria listed in this table are based on an assumed hardness of 100 mg/L. *See* 40 C.F.R. § 131.38.

1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 10/1/10 | North Side | Copper | 0.29 | mg/L | 0.0123 | 23.58 | 0.014 |
| 10/1/10 | North Side | Iron | 29.0 | mg/L | 1.0 | 29 | |
| 10/1/10 | North Side | Lead | 0.13 | mg/L | 0.069 | 1.88 | 0.082 |
| 10/1/10 | North Side | SC | 670 | umhos/cm | 200 | 3.35 | |
| 10/1/10 | North Side | TSS | 1100 | mg/L | 100 | 11 | |
| 10/1/10 | North Side | Zinc | 1.6 | mg/L | 0.11 | 14.55 | 0.12 |
| 10/1/10 | South Side | Aluminum | 34.0 | mg/L | 0.75 | 45.33 | |
| 10/1/10 | South Side | COD | 2000 | mg/L | 120 | 16.67 | |
| 10/1/10 | South Side | Copper | 0.38 | mg/L | 0.0123 | 30.89 | 0.014 |
| 10/1/10 | South Side | Iron | 51.0 | mg/L | 1.0 | 51 | |
| 10/1/10 | South Side | Lead | 0.39 | mg/L | 0.069 | 5.65 | 0.082 |
| 10/1/10 | South Side | O&G | 24 | mg/L | 15 | 1.6 | |
| 10/1/10 | South Side | SC | 1200 | umhos/cm | 200 | 6 | |
| 10/1/10 | South Side | TSS | 2200 | mg/L | 100 | 22 | |
| 10/1/10 | South Side | Zinc | 3.1 | mg/L | 0.11 | 28.18 | 0.12 |
| 10/7/10[5] | North Side | Aluminum | 15.0 | mg/L | 0.75 | 20 | |
| 10/7/10 | North Side | Copper | 0.13 | mg/L | 0.0123 | 10.57 | 0.014 |
| 10/7/10 | North Side | Iron | 19.0 | mg/L | 1.0 | 19 | |
| 10/7/10 | North Side | Lead | 0.07 | mg/L | 0.069 | 1.01 | 0.082 |
| 10/7/10 | North Side | O&G | 21 | mg/L | 15 | 1.4 | |
| 10/7/10 | North Side | SC | 1200 | umhos/cm | 200 | 6 | |
| 10/7/10 | North Side | TSS | 600 | mg/L | 100 | 6 | |
| 10/7/10 | North Side | Zinc | 0.49 | mg/L | 0.11 | 4.45 | 0.12 |
| 12/7/10[6] | South Side | Aluminum | 15.0 | mg/L | 0.75 | 20 | |
| 12/7/10 | South Side | Copper | 0.15 | mg/L | 0.0123 | 12.2 | 0.014 |
| 12/7/10 | South Side | Iron | 22.0 | mg/L | 1.0 | 22 | |

[5] The results of this sample were typed into a table included in the 2009-2010 Annual Report for the Facility, laboratory results were not provided, so Waterkeeper assumes that the listed date of 10/7/2010 is a typographical error and the correct date of the sample is 10/7/2009, since the listed date of 10/7/2010 is not during the 2009-2010 Wet Season.

[6] The results of this sample were typed into a table included in the 2009-2010 Annual Report for the Facility, laboratory results were not provided, so Waterkeeper assumes that the listed date of 12/7/2010 is a typographical error and the correct date of the sample is 12/7/2009, since the listed date of 12/7/2010 is not during the 2009-2010 Wet Season.

2

| Date | Location | Parameter | | mg/L | | | |
|---|---|---|---|---|---|---|---|
| 12/7/10 | South Side | Lead | 0.17 | mg/L | 0.069 | 2.46 | 0.082 |
| 12/7/10 | South Side | O&G | 110 | mg/L | 15 | 7.33 | |
| 12/7/10 | South Side | SC | 370 | umhos/cm | 200 | 1.85 | |
| 12/7/10 | South Side | TSS | 1100 | mg/L | 100 | 11 | |
| 12/7/10 | South Side | Zinc | 1.3 | mg/L | 0.11 | 11.82 | 0.12 |
| 11/4/11 | MP2 | Copper | 0.078 | mg/L | 0.0123 | 6.34 | 0.014 |
| 11/4/11 | MP2 | O&G | 20 | mg/L | 15 | 1.33 | |
| 11/4/11 | MP2 | SC | 270 | umhos/cm | 200 | 1.35 | |
| 11/4/11 | MP2 | TOC | 780 | mg/L | 110 | 7.09 | |
| 11/4/11 | MP2 | TSS | 320 | mg/L | 100 | 3.2 | |
| 11/4/11 | MP3 | Aluminum | 5.4 | mg/L | 0.75 | 7.2 | |
| 11/4/11 | MP3 | Copper | 0.034 | mg/L | 0.0123 | 2.76 | 0.013 |
| 11/4/11 | MP3 | O&G | 18 | mg/L | 15 | 1.2 | |
| 11/4/11 | MP3 | SC | 2600 | umhos/cm | 200 | 13 | |
| 11/4/11 | MP3 | TOC | 4500 | mg/L | 110 | 40.9 | |
| 11/4/11 | MP3 | TSS | 2400 | mg/L | 100 | 24 | |
| 11/4/11 | MP3 | Zinc | 0.18 | mg/L | 0.11 | 1.64 | 0.12 |
| 3/17/12 | Dock | Copper | 0.014 | mg/L | 0.0123 | 1.14 | 0.013 |
| 3/17/12 | MP2 | Aluminum | 1.1 | mg/L | 0.75 | 1.47 | |
| 3/17/12 | MP2 | Copper | 0.017 | mg/L | 0.0123 | 1.38 | 0.013 |
| 3/17/12 | MP2 | Iron | 1.6 | mg/L | 1.0 | 1.6 | |
| 3/17/12 | MP2 | pH | 5.4 | pH units | 6.0-9.0 | n/a | |
| 3/17/12 | MP2 | SC | 1000 | umhos/cm | 200 | 5 | |
| 3/17/12 | MP2 | TOC | 1800 | mg/L | 110 | 16.36 | |
| 3/17/12 | MP2 | TSS | 780 | mg/L | 100 | 7.8 | |
| 3/17/12 | MP2 | Zinc | 0.12 | mg/L | 0.11 | 1.09 | |
| 3/17/12 | MP3 | Aluminum | 3.1 | mg/L | 0.75 | 4.13 | |
| 3/17/12 | MP3 | Copper | 0.054 | mg/L | 0.0123 | 4.39 | 0.013 |
| 3/17/12 | MP3 | Iron | 4.6 | mg/L | 1.0 | 4.6 | |
| 3/17/12 | MP3 | SC | 850 | umhos/cm | 200 | 4.25 | |
| 3/17/12 | MP3 | TOC | 2100 | mg/L | 110 | 19.09 | |
| 3/17/12 | MP3 | TSS | 2000 | mg/L | 100 | 20 | |

3

| Date | Location | Parameter | | Units | | |
|---|---|---|---|---|---|---|
| 3/17/12 | MP3 | Zinc | 0.13 | mg/L | 0.11 | 0.12 |
| 3/17/12 | MP4 | Aluminum | 4.0 | mg/L | 0.75 | 5.33 |
| 3/17/12 | MP4 | Copper | 0.041 | mg/L | 0.0123 | 3.33 | 0.013 |
| 3/17/12 | MP4 | Iron | 4.4 | mg/L | 1.0 | 4.4 |
| 3/17/12 | MP4 | SC | 770 | umhos/cm | 200 | 3.85 |
| 3/17/12 | MP4 | TOC | 1200 | mg/L | 110 | 10.91 |
| 3/17/12 | MP4 | TSS | 3300 | mg/L | 100 | 33 |
| 10/11/12[7] | MP-2 (A) | Aluminum | 19.0 | mg/L | 0.75 | 25.33 |
| 10/11/12 | MP-2 (A) | COD | 9900 | mg/L | 120 | 82.5 |
| 10/11/12 | MP-2 (A) | Copper | 0.75 | mg/L | 0.0123 | 60.96 | 0.013 |
| 10/11/12 | MP-2 (A) | Iron | 36.0 | mg/L | 1.0 | 36 |
| 10/11/12 | MP-2 (A) | Lead | 0.2 | mg/L | 0.069 | 2.9 | 0.082 |
| 10/11/12 | MP-2 (A) | O&G | 22 | mg/L | 15 | 1.47 |
| 10/11/12 | MP-2 (A) | SC | 4900 | umhos/cm | 200 | 24.5 |
| 10/11/12 | MP-2 (A) | TSS | 1400 | mg/L | 100 | 14 |
| 10/11/12 | MP-2 (A) | Zinc | 4.4 | mg/L | 0.11 | 40 | 0.12 |
| 10/11/12 | MP-2 (B) | Aluminum | 29.0 | mg/L | 0.75 | 38.67 |
| 10/11/12 | MP-2 (B) | COD | 9500 | mg/L | 120 | 79.17 |
| 10/11/12 | MP-2 (B) | Copper | 3.3 | mg/L | 0.0123 | 268.29 | 0.013 |
| 10/11/12 | MP-2 (B) | Iron | 56.0 | mg/L | 1.0 | 56 |
| 10/11/12 | MP-2 (B) | Lead | 0.36 | mg/L | 0.069 | 5.22 | 0.082 |
| 10/11/12 | MP-2 (B) | SC | 4000 | umhos/cm | 200 | 20 |
| 10/11/12 | MP-2 (B) | TSS | 1600 | mg/L | 100 | 16 |
| 10/11/12 | MP-2 (B) | Zinc | 7.7 | mg/L | 0.11 | 70 | 0.12 |
| 1/25/13 | MP 2 Post-Filter | Aluminum | 5.5 | mg/L | 0.75 | 7.33 |
| 1/25/13 | MP 2 Post-Filter | COD | 490 | mg/L | 120 | 4.08 |
| 1/25/13 | MP 2 Post-Filter | Copper | 0.039 | mg/L | 0.0123 | 3.17 | 0.013 |
| 1/25/13 | MP 2 Post-Filter | Iron | 6.6 | mg/L | 1.0 | 6.6 |
| 1/25/13 | MP 2 Post-Filter | SC | 260 | umhos/cm | 200 | 1.3 |

[7] The RA Facility Owners and/or Operators reported in the 2012-2013 Annual Report that this sample was taken on 10/12/2012, but the laboratory report states that it was taken on 10/11/2012.

| Date | Location | Parameter | | Unit | | | |
|---|---|---|---|---|---|---|---|
| 1/25/13 | MP 2 Post-Filter | TSS | 180 | mg/L | 100 | 1.8 | 0.12 |
| 1/25/13 | MP 2 Post-Filter | Zinc | 0.35 | mg/L | 0.11 | 3.18 | |
| 1/25/13 | MP 3 Post-Filter | Aluminum | 11 | mg/L | 0.75 | 14.67 | |
| 1/25/13 | MP 3 Post-Filter | COD | 2000 | mg/L | 120 | 16.67 | |
| 1/25/13 | MP 3 Post-Filter | Copper | 0.079 | mg/L | 0.0123 | 6.42 | 0.013 |
| 1/25/13 | MP 3 Post-Filter | Iron | 16 | mg/L | 1.0 | 16 | |
| 1/25/13 | MP 3 Post-Filter | SC | 1600 | umhos/cm | 200 | 8 | |
| 1/25/13 | MP 3 Post-Filter | TSS | 690 | mg/L | 100 | 6.9 | |
| 1/25/13 | MP 3 Post-Filter | Zinc | 1.0 | mg/L | 0.11 | 9.09 | 0.12 |

5

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES JUDGES

This case has been assigned to District Judge _____ Virginia A. Phillips _____ and the assigned Magistrate Judge is _____ David T. Bristow _____ .

The case number on all documents filed with the Court should read as follows:

## EDCV14-00070 VAP (DTBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge.

Clerk, U. S. District Court

| January 13, 2014 | By   L. Murray |
|---|---|
| Date | Deputy Clerk |

---

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

**Subsequent documents must be filed at the following location:**

| ☐ Western Division | ☐ Southern Division | ☒ Eastern Division |
|---|---|---|
| 312 N. Spring Street, G-8 | 411 West Fourth St., Ste 1053 | 3470 Twelfth Street, Room 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701 | Riverside, CA 92501 |

**Failure to file at the proper location will result in your documents being returned to you.**

---

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

INLAND EMPIRE WATERKEEPER, a program of Orange County Coastkeeper; ORANGE COUNTY COASTKEEPER, a California non-profit corporation

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

BURRTEC WASTE GROUP, INC., a California corporation; BURRTEC WASTE INDUSTRIES, INC., a California corporation; AGUA MANSA MRF, LLC, a California limited liability company

**(b)** County of Residence of First Listed Plaintiff   Riverside
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   San Bernardino
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.
Daniel Cooper (Bar No. 153576)
Lawyers for Clean Water, Inc.
1004A O'Reilly Avenue, San Francisco, California, 94129
(415) 440-6250

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
33 U.S.C. §§ 1251 et seq. (Clean Water Act); discharges of pollutants in violation of the Clean Water Act and California Permit for Discharges of Stormwater Associated with Industrial Activities

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☒ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:

CV-71 (11/13)

**CIVIL COVER SHEET**

ED CV 14 - 00070   VAP (DTBx)

Page 1 of 3

'JAN 13 2014

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII.   VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes  [X] No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Los Angeles | Western |
| | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?**<br>Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?**<br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [ ] Yes  [X] No | [ ] Los Angeles | [ ] Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [X] | [ ] | [ ] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [ ] | [X] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [ ] | [X] | [ ] | [ ] |

**C.1. Is either of the following true? If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

[X] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | **EASTERN DIVISION** |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** *Caroline Koch*   DATE: *12/16/2013*

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |